## 11731

### CITIZENS' BANK v. HEYWARD

#### (133 S. E., 709)

1. USURY—CONTRACT TO PAY BANK 8 'PER CENT. INTEREST AND ADDITIONAL 2 PER CENT. TO PRESIDENT OF BANK PERSONALLY HELD TO CONSTITUTE USURY.—Contract, whereby borrower agreed to pay Bank 8 per cent. interest and additional 2 per cent. to president of bank personally, *held* to constitute usury.

2. PRINCIPAL AND AGENT.—Principal is responsible for tortious acts of agent performed within scope of his authority. (Per Gary, C. J., Watts, J., and DeVore, Henry, Rice, Townsend, and Bonham, Circuit Judges.)

3. APPEAL AND ERROR.—Facts, in action to foreclose mortgage, are reviewable to determine whether there was usury, being an equity case. (Per Gary, C. J., Watts, J., and DeVore, Henry, Rice, Townsend, and Bonham, Circuit Judges.)

4. BANKS AND BANKING.—As respects imputation of president's knowledge of usury to bank, bank *held* benefitted by fraudulent act of president in taking 2 per cent. additional interest, in that a borrower was secured for the bank, making bank liable under Code Civ. Proc. 1922, §§ 3638, 3640, for usury. (Per Gary, C. J., Watts, J., and DeVore, Henry, Rice, Townsend, and Bonham, Circuit Judges.)

5. USURY.—Code Civ. Proc. 1922, § 3640, providing no lender shall be charged with usury for money paid to another to induce loan, where lender neither took nor contracted to take more than lawful interest, *held* not to repeal penalty for usury under Section 3639. (Per Gary, C. J., Watts, J., and Featherstone, Shipp, DeVore, Henry, Rice, Townsend, and Bonham, Circuit Judges.)

6. BANKS AND BANKING—KNOWLEDGE OF BANK PRESIDENT, MAKING LOAN AT 8 PER CENT. WITH 2 PER CENT. ADDITIONAL TO HIM PERSONALLY, THAT CONTRACT WAS USURIOUS, MUST BE IMPUTED TO BANK, WHERE NO OTHER OFFICER HAD ANYTHING TO DO WITH CONTRACT.—Where loan 'at 8 per cent. interest to bank and 2 per cent. additional to president thereof was made by president and no other officer had anything to do with the contract, president's knowledge that loan constituted usury must be imputed to bank. (Per Featherstone and Shipp, Circuit Judges.)

7. CORPORATIONS—PRINCIPAL AND AGENT.—Generally, notice to agent is notice to principal, particularly in the case of corporations. (Per Featherstone and Shipp, Circuit Judges.)

8. USURY—STATUTE PROVIDING THAT NO LENDER SHALL BE CHARGED WITH USURY BECAUSE MONEY WAS PAID TO OTHERS BY BORROWER IN ORDER TO OBTAIN LOAN, WHERE LENDER DID NOT TAKE NOR CONTRACT TO TAKE MORE THAN LAWFUL INTEREST, HELD NOT TO OPERATE RETROSPECTIVELY (Code Civ. Proc. 1922, § 3640).—Code Civ. Proc. 1922, § 3640, providing that no lender shall be charged with usury for money paid or agreed to be paid others in order to obtain loan, where lender neither took nor contracted to take more than lawful interest, *held* not to operate retrospectively. (Per Featherstone and Shipp, Circuit Judges.)

9. STATUTES.—Statutes are to be construed as having only prospective operation, unless purpose to give them retrospective effect is expressly declared, or necessarily implied from language used. (Per Featherstone and Shipp, Circuit Judges.)

Before JOHNSON, J., Berkeley, April, 1924. Reversed and remanded.

Action by the Citizens' Bank against Marie H. Heyward. Judgment for plaintiff, and defendant appeals.

*Messrs. Whaley, Barnwell & Grimball,* for appellant, cite: *Loan by bank at eight per cent., plus two per cent. commission paid to president of bank for arranging loan, usurious:* 104 S. C., 152; 92 S. E., 394; 83 S. C., 521; 50 S. C., 290; 43 S. C., 528; 40 S. C., 151; 33 S. C., 473; 17 S. C., 361; 11 S. C., 408; 39 Cyc., 973. *Same; rule changed where excessive commission charged by \agent without sanction of lender:* Civ. Code, 1922, Sec. 3640; 104 S. C., 152. *Principal liable for acts of agent within scope of his agency, though acting contrary to instructions:* 82 S. C., 528; 82 S. C., 317; 77 S. C., 549; 76 S. C., 217. *President of bank is its alter ego:* 92 S. E., 394; 33 S. E., 848; 50 S. C., 290; 43 S. C., 528. *Cases distinguished:* 50 S. C., 281; 145 Ill., 481.

*Messrs. Hagood, Rivers & Young,* for respondent, cite: *Knowledge of agent engaged in fraud for his own benefit not imputable to principal:* 50 S. C., 288. *Violation of law not within apparent scope of business agency:* 116 N. W., 169; 19 L. R. A. (N. S.), 399. *Acceptance of personal commission not within apparent scope of general agency to*

*lend money:* 114 N. Y., 452; 21 N. E., 1007; 109 N. Y., 473; 17 N. E., 379; 66 N. Y., 466; 21 N. Y., 219; 33 Conn., 81; 44 Iowa, 33; 28 N. J. Eq., 568; 18 N. J. Eq., 481; 16 N. J. Eq., 537; 145 Ill., 481.

December 8, 1925.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

When this case was heard the first time by the Supreme Court, the opinion was delivered by Mr. Justice Fraser, who has since died.

The following is the opinion which he wrote, except 1, 2 a quotation from the case of *Mayfield v. Mortgage Co.,* 104 S. C., 158; 88 S. E., 370, which is omitted:

"The facts, in brief, are: Miss Heyward, the defendant, sent her brother, who was her agent, to the plaintiff Bank to borrow money. The agent negotiated the loan with Mr. Brown, the president of the Bank, who was fully authorized by his Bank to make loans. The contract between Mr. Heyward and Mr. Brown, the president of the Bank, and also a director of the Bank, was that Miss Heyward should pay 8 per cent. to the Bank and 2 per cent. to Brown, personally. This loan went on for years. The 8 per cent. was paid to a clerk of the Bank and the 2 per cent. was paid to the president. These two were to run with the life of the loan. Was it usury? The trial Court held that it was not usury. We think it was usury.

"It does not need the citation of authority to show that a principal is responsible for the tortious acts of his agent, performed within the scope of his authority. The principal is responsible for the unlawful manner in which the agent does an authorized act. *It makes no difference by what name a thing may be called, when we are uncovering a violation of the law, but what is its nature. It makes no difference that two checks were made instead of one. In the Mayfield Case the fee was so large as to indicate that it was not intended*

*as a fee—only a cloak for usury. In that case there was a basis for the charge of a fee. Here the plaintiff did not do the law the reverence to even claim that there was a basis of service for which two per cent. was charged. But the contract was that the two per cent. was to continue during the life of the loan.* The contract was that the president and a clerk in the Bank should receive ten per cent. for the loan, during the life of the loan, and is usurious. We have seen that even though the payment was voluntarily made, it is immaterial." (Italics added.)

"*If this case is affirmed, the statutes against usury are dead. Any money-lending concern can employ a loan agent who will charge for himself unlimited usury, and no one can show that behind closed doors the money-lender himself not only got his legal eight per cent., but another eight per cent. too.*" (Italics added.)

"The judgment is reversed.

"Mr. Justice Watts concurred.

"Mr. Justice Marion concurred in result.

"Mr. Acting Associate Justice W. C. Cothran dissented.

"Mr. Chief Justice Gary and Mr. Justice Cothran did not participate."

C. R. I. Brown, a witness for the plaintiff, testified as follows:

"I was the president of the Bank when these loans were made. The by-laws contain the following provisions as to the duties of the president: 'He shall call the directors together when he deems it necessary. He shall at all times exercise general supervision over the directors of the affairs of the corporation. He shall have general superintendence and direction of all officers and employees of the corporation. He shall see that their duties are properly performed and shall perform all services pertaining to the office of president of the banking corporation.' * * * It was the custom of the Bank that the president made the loans for the Bank. The president was usually the agent of the

Bank in making loans. That custom was carried out practically through the existence of the Bank.

"I was present at the directors' meeting when this loan was discussed. My impression is· that the directors authorized the increase of the. loan to $7,020. *The question of the two· per cent. commission was not taken up with the directors.* It never went into the funds of the Bank. They did not know that it was being paid to me individually." (Italics added.)

"Recross-Examination:

"Q. Did the directors authorize the increase of $770 after it had been made or before it was made? A. My recollection is that when the loan was raised to $7,020 it was discussed as to the advisability of lending additional money to Mr. Heyward. That is my impression. I have looked over the minutes to see if there was any record of that, but I can't find in the minutes where there was any record of it, but *I am sure that a discussion of that account was had with my board because we had done that on several occasions when Mr. Heyward requested an additional sum of money.* I fail to find in the minute book as yet, casually· looking over it, any.record where it was brought up at any of these meetings, except this, that the loan has been passed from time to time by the board after it was recorded." (Italics added.)

*"I could assume the authority as president to make the loan anyhow. That was usually the custom of the Bank, in case the president cared to have additional information as· to whether or not to make the loan.* (Italics added.)

"It was so vivid in my mind because I wanted to be sure that there wasn't any question as to the value of the collateral without reference to Mr. Heyward paying a commission. At that time a statement was made by me personally that I didn't feel that he should have to pay a commission if the loan was good, and we considered it good, and he stated that he would like me to have it, and he knew

me personally, and so 'I would like you to have this money.' he said, *'If I don't pay it to you, I will have to pay it to another bank on Broad Street.'*    (Italics added.)

"*I can't state positively that Nat. Heyward never sent one check for both the eight per cent. and the two per cent. interest by mail, drawn to the order of the Citizens' Bank, and I am almost willing to say that he did not do it; that would not impress me at all with being the right thing for Nat. to do to send a check to cover these two amounts. He could have done it, but I doubt very seriously if the Bank would have had anything to do with the check.*"    (Italics added.)

The following letter was put in evidence:

"March 15, 1920.

"Mr. C. R. I. Brown, Charleston, S. C.—Dear Sir: Having paid the interest on a bond and mortgage of Marie H. Heyward, for which I am acting in her stead as her agent, from time to time in the Citizens' Bank, it is understood that I have been paying the Citizens' Bank 8 per cent. interest as called for by the bond and mortgage and 2 per cent. to you personally as commission for said loan.

"This is in accordance with my policy and has been done during the life of the bond, it being understood that we now owe the Bank six months' interest in advance at the rate of 8 per cent.

"Yours very truly,.

"MARIE H. HEYWARD,.

"Per N. Heyward, Agt."

Nathaniel Heyward, a witness for the defendant, testified as follows:

"These payments of eight per cent. to the Bank and two per cent. to Mr. Brown, the president of the Bank, were made *continuously from 1912, when the first loan was made, up to 1920,* when this letter was sent by me. I always figured the amount at each payment. *The extra two per cent. was paid on the whole principal of the loan as the principal*

*was increased from time to time.* The interest was paid on the whole amount and was increased as the principal." (Italics added.)

The following findings of fact by his Honor, the Circuit Judge:

"That Nat. Heyward, the brother and agent of the defendant, Marie H. Heyward, *offered* to C. R. I. Brown, the president of the Citizens' Bank, a commission of two per cent. of the amount of the loan, which was *offered* and *accepted* by Brown as his personal money, and was not paid to the Bank. Interest at the rate of eight per cent. per annum was paid to the Bank, and the two per cent. commission paid to Brown was handled separately, and was paid to him for his own individual use and benefit, unknown, unauthorized, and not ratified by the Bank, as a personal commission of two per cent. on the loan during its life. There is no testimony tending to show that the Bank ever received any portion of the commission, or that it benefited in any way by Brown's unlawful act. There is, likewise, a total failure of proof that the Bank knew of, authorized, or ratified the unlawful act of its president.

"*It does not appear that the commission was made a condition to making or renewing the loans, and it appears that the mortgagor voluntarily paid the commission. The receipt by Brown personally of the commission was reprehensible and cannot be too severely condemned,* but the voluntary offer to pay the commission shows that the usual 'oppressiveness' incident to usurious loans was absent in the case at bar." (Italics added.)

"While it might have been within the scope of the president's agency to charge and collect a commission for *the use and benefit of the Bank,* surely it cannot be contended that, in the absence of the Bank's knowledge, authorization, or ratification, that he was acting within the scope, or even in the apparent scope of his agency, or for his Master's business in exacting such a commission for his own per-

sonal use and benefit; certainly not in the absence of some proof that he was thus compensated for his services rendered to the Bank as its employee or agent."

The exceptions are as follows:

"I. His Honor, the Circuit Judge, erred, it is respectfully submitted in decreeing that the plaintiff, Citizens' Bank, should have judgment against the defendant, Marie H. Heyward, in the sum of $7,020, with interest and attorney's fees and for the sale of the mortgaged property. The error being:

"(a) That the loan was usurious because the president of the Bank, who was also a director in the Bank, and was by the custom of the Bank, in charge of making the loans for the Bank, and who made this loan for the Bank, collected in interest for himself, in addition to the eight per cent. paid to the Bank, two per cent. on the principal of the loan which the Circuit Judge found as a fact to have been done during the life of the loan from March 20, 1912, to November 24, 1919, which amounts to $3,502.33, interest paid to the Bank at eight per cent., and $875.59, paid to the president, director, and agent of the Bank in making the loan.

"(b) The Circuit Judge should have found that Marie H. Heyward was entitled to offset against the loan an amount equal to twice the amount of interest paid, amounting to twice $4,377.92, or $8,755.84.

"II. The Circuit Judge should have held the loan usurious on the grounds that the rule of law in South Carolina is that the receiving of excessive and unreasonable commissions by the agent of the lender with the knowledge, actual or constructive, of the principal, renders the transaction usurious, if such commissions and the interest added exceed the lawful rates. And as Brown, the president and director of the Bank, was the agent of the Bank in making this loan, his knowledge with respect to the commissions is imputable to the plaintiff Bank."

14—S. C.—135.

The only case from South Carolina upon which his Honor, the Circuit Judge, based his conclusion, was *Knobelock v. Bank,* 50 S. C., 259; 27 S. E., 962. The facts in the present case are entirely different from those in the case of *Knobelock v. Bank, supra,* in the vital particular that in the *Knobelock Case* the law as to imputed notice to the principal was not involved, *for the reason that the jury had found that there was no such notice and the verdict was final.* Therefore, any rulings of the Court upon that question were purely *obiter dicta.*

In the case of *Garvin v. Garvin,* 27 S. C., 472; 4 S. E., 148, the Court says:

"The Court, however, is not considered as bound by the argument of an opinion, but only by what is decided by it. The remark referred to was made in the course of argument, was unnecessary to the question then under consideration, and was one of those observations which, as some one has well said, 'fall from a Judge on a legal question suggested by a case before him, but not arising in such a manner as to require decision by him. It is, therefore, not binding as a precedent on other Judges, although it may be entitled to more or less respect,' etc. The question now made for the first time is *res integra.*"

The language used in the *Knobelock Case* would be cited to sustain the appellant's exceptions, but for the fact that the question then before the Court is not involved in this case, as will be seen by reference to the following language:

"The question was not whether Small was acting for himself as Trustee, or for himself as an individual, but whether, in the transaction of drawing out the deposit, he was in any way acting for the Bank. Knowledge of Small's fraudulent intent with reference to the deposit was not imputable to the Bank, unless, in the particular transaction of paying out and receiving the deposited money, Small acted for the Bank. * * *

"The real question was whether in the transaction under

consideration Small was acting as agent for the Bank. The Bank is presumed to know what its president knew as its agent, but not what Small knew as its executor. * * *

"Besides this, he had already, at plaintiff's request, charged that 'knowledge brought home to the agent of the corporation possessing authority to act, and acting in the matter to which the notice relates, is the strongest case for charging a corporation with notice of matter known to its agents,' in accordance with the decision in *Webb v. Graniteville Manufacturing Co.,* 11 S. C., 408. * * * [32 Am. Rep., 479.]

"Participation by the principal in the fruits of the agent's fraud is not the test whether the agent's knowledge is imputable to the principal, but it affords evidence on the question whether the agent in the fraudulent transaction was acting within the scope of his agency, previously authorized or subsequently ratified, which is the test. * * *

"In the relation of the principal to a third party, the undisputed rule exists, that notice to the agent is notice to the principal, if the agent comes to the knowledge of facts while he is acting for the principal. * * *

"See, also, *Akers v. Rowan,* 33 S. C., 473; 12 S. E., 172; 10 L. R. A., 705, where the Court said: 'The Circuit Judge overlooked the qualifications to the admitted general rule, that notice to the agent is notice to the principal. Sloan, though he was at the time the solicitor of the Bank and one of its directors did not acquire knowledge of the fact that suits were commenced against Robbins while acting in either of those capacities.' * * *

"Speaking of the last-mentioned case, this Court, in *Raply* [Rapley] *v. Klugh,* 40 S. C., 151; 18 S. E., 686, said: 'The Bank was exonerated from responsibility of the knowledge of its agent (solicitor and director), because such knowledge of its agent was not acquired while engaged in business for the Bank, but was acquired while acting as the solicitor of Robbins himself.' * * *

"In the case of *Bickley v. Bank,* 39 S. C., 294; 17 S. E.,

977; 9 Am. St. Rep., 721, the Court sustained the following charge by the Circuit Judge: 'If the president of the Bank commits a fraud relative to a subject that does concern his duty to the Bank in dealing with strangers and other persons having business with the Bank, the corporation will be liable to such third person or persons for such acts and misdeeds of its president and agent.' "

As this is an equity case, the facts are reviewable for the purpose of determining whether there was usury on the part of the Bank, or not.

After carefully considering the facts, we have reached the conclusion that there was a well-planned scheme by the Bank itself to charge usury. Of course, it would not be natural to expect that this would be shown except from circumstantial evidence. The scheme was that the payment of the two per cent., called commissions, was *to continue as long as the loan was unpaid*. President Brown did not negotiate the loan as an *individual*, for if he had done so, he would not have continued to receive it, *during the life of the loan*. The letter written by Mr. Heyward to the president simply shows that he did not intend to take advantage of the fact that the contract was *usurious, and was a mere blind*. The statement of Mr. Heyward to President Brown that, "If I don't pay it to you, I will have to pay it to another bank on Broad Street," shows that he was *compelled* to pay usury in order to get the money. The following statement of President Brown shows upon its face that the facts were not correctly stated:

"I can't state positively that Nat. Heyward never sent one check for both the eight per cent. and the two per cent. interest by mail drawn to the order of the Citizens' Bank, and I am almost willing to say that he did not do it; that would not impress me at all with being the right thing for Nat. to do, to send a check to cover these two amounts. He could have done it, but I doubt very seriously if the

Bank would have had anything to do with the check"—
*for that would have exposed the usurious contract.*

The principle of imputed notice is thus stated in *Reynolds v. Witte,* 13 S. C., 5; 36 Am. Rep., 678:

"There is nothing to distinguish this from the ordinary case where one, for convenience, employs another to act as his agent in a particular business, or to exempt Reynolds and Caldwell & Sons from the principles which ordinarily attach to the relation of principal and agent. Of all these principles there is not one more important than that which makes the act of the agent, within the scope of his authority, the act of the principal—*'qui facit per alium, facit per se.'* Caldwell & Sons were the agents of Reynolds, and they misappropriated, and thereby, for the purpose of this case, destroyed the collaterals of Witte. Is Reynolds liable for that act? If Reynolds himself had done the act there can be no doubt that he would have been liable to Witte. * * *

"What is the proper understanding of the phrase 'within the scope of the agency'? Does 'the scope' include negligence and exclude fraud? It cannot properly be restricted to what the parties intended in the creation of the agency, for that would also exclude negligence, as no agent is appointed for the purpose of being negligent, any more than for the purpose of acting fraudulently. The question cannot be determined by the authority intended to be conferred by the principal. We must distinguish between the authority to commit a fraudulent act and the authority to transact the business in the course of which the fraudulent act was committed. Tested by reference to the intention of the principal, neither negligence nor fraud is within 'the scope of the agency'; but tested by the connection of the act with the property and business of the agency, *fraud* in taking the very property is as much 'within the scope of the agency' as negligence in allowing others to take it. The proper inquiry is, *whether the act was done in the course of the agency and by virtue of the authority as agent.* If it was, then the

principal is responsible, whether the act was merely negligent or fraudulent."

In Smith's Mercantile Law it is said:

"The principal has been thought to be responsible, not merely for the negligence, but for the deliberate fraud of his agent committed in the execution of his employment, though without the principal's authority, as, for instance, by selling false jewels for true ones. The reason given for this by Lord C. J. Holt, appears a sensible one. *'Seeing,' says he, 'that some one must be loser by the deceit, it is more seasonable that he who employs and confides in the deceiver, should be the loser than a stranger. Such, certainly, was the opinion of the Roman lawyers.' "* (Italics added.)

The principle is well stated in Story on Agency, § 452:

"It is a general doctrine of law that, although the principal is not ordinarily liable (for he sometimes is) in a criminal suit for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in them, yet he is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, negligences, and other malfeasances, and omissions of duty of his agent, *in the course of his employment,* although the principal did not authorize or justify or participate in, or indeed know of such misconduct, or even if he forbade the acts or disapproved of them. In all such cases the rule applies *respondeat superior;* and *it is found upon public policy and convenience, for in no other way could there be any safety to third persons in their dealings, either directly with the principal or indirectly with him, through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency."* (Italics added.)

The language from Smith's Mercantile Law and Story on Agency were quoted with approval by Justice McGowan.

who delivered the opinion of the Court in *Reynolds v. Witte,*
13 S. C., 5; 36 Am. Rep. 678.

In the case of *Union Bank v. Wando Mining & Manu-*
*facturing Co.,* 17 S. C., 361, this Court says:

"Mr. Mowry was president of the Union Bank, and a di-
rector of the Wando Mining & Manufacturing Company,
during all the time of the occurrences which had the effect
to deprive the president and secretary of the company of all
powers of agency, *and was present at the meetings of the*
*company at which they took place, and was president of the*
*Bank at the times when those notes were discounted.* His
knowledge was, therefore, *official, and the Bank is bound*
*by the legal effect of his knowledge."* (Italics added.)

Mr. Justice Cothran thus concludes his opinion:

"It has been suggested that it is against public policy
for this Court to countenance the exaction by the president
of a bank of a commission for his personal service in nego-
tiating a loan by his bank, and that the affirmance of Judge
Johnson's decree, widely spread as it will be, would work
havoc with borrowers and practically annihilate the usury
laws of the State.

"It seems to be assumed that the affirmance of the decree
amounts to an approval of such conduct. This assump-
tion is wide of the mark; *the Court considers it a most fla-*
*grant and reprehensible breach of trust, deserving the se-*
*verest judicial condemnation;* what the affirmance means
is that the Bank *is not liable for the penalties of the usury*  .
*statute."* (Italics added.)

"That the Bank might be liable to a borrower who might
bring suit against it for the recovery of the illegal exac-
tion, we entertain no doubt. Such exaction forced by the
president of a bank occupying a fiduciary situation, and
acting within the actual scope of his agency, would con-
stitute a tort, for which his principal would be liable, just
as a railroad company would be liable to a passenger for
the return of an illegal fare collected by a conductor.

"But the liability of the Bank for the penalties of the usury statute and its liability to return the illegal exaction are entirely different matters.

"The declaration by the Court of the Bank's liability to return the illegal exaction should demonstrate the fallacy of the suggestion that the Court approved of such conduct by an officer of a bank, and should allay the apprehension that the officers of other banks will be emboldened by the decision to follow the abhorred example of the president in this case.

"The Court would welcome the opportunity of giving the mortgagor in this case credit for the two per cent. commissions collected by the president if the pleadings justified such relief; but the counterclaim is based solely upon the penalties under the usury statute and we see no way to do so.

"We think, however, that the defendant should be allowed to move the Circuit Court for an order permitting her to amend her answer by setting up this liability as a counterclaim, this Court reserving the question whether a claim in tort can be set up as a counterclaim in an action upon contract. If it cannot be, the defendant's remedy by a separate action is open to her.

"As to the matter of public policy: The primary source of the declaration of the public policy of the State is the General Assembly; the Courts assume this prerogative only in the absence of legislative declaration. The General Assembly has spoken and declared that the exaction of a commission by an intermediary shall not constitute usury, and this Court has no power to decide otherwise. The Court, however, has the power, the General Assembly having made no declaration upon the subject, to declare that public policy requires that the Bank shall be liable for the tort committed by the president of a bank in the collection of an illegal exaction from a borrower.

"The difficulty in the minds of those members of the

Court who favor a reversal of the decree, it is respectfully suggested, lies in. the application of the familiar principle that a principal is liable for the acts of an agent within the scope of his agency, and in failing to distinguish between the liability of the principal for a penalty and its liability in damages for the tortious act. The former cannot be enforced except under the statute prescribing the conditions of such liability; the latter under the principles of the common law.

"The judgment of this Court is that the judgment of the Circuit Court be affirmed with leave to other defendant to move for an amendment of her answer as above indicated."

Mr. Justice Cothran states that the decree of his Honor, Judge Johnson, should be affirmed for the following reasons:

"1. The payment by the borrower, of a commission to the agent of the lender where it, together with the interest charged, exceeds the lawful rate, cannot be construed usury unless the lender was cognizant of the illegal exaction.

"2. The knowledge of an agent of an illegal exaction by himself cannot be imputed to the principal as notice thereof, where the agent's act is contrary to law, against the interest of the principal and for his personal benefit.

"3. Assuming that under the law as it stood prior to the passage of the Act of 1916 (Code of 1922, Volume 3, § 3640), the transaction in question may have been judicially declared usurious, at the time of trial the penalty therefor under Section 3639 had been repealed by Section 3640, and was not recoverable."

Sections 3638, 3639, and 3640, Code of Laws 1922, are as follows:

"Sec. 3638. No greater interest than seven (7) per cent. per annum shall be charged, taken, agreed upon or allowed upon any contract arising in this State for the hiring, lending or use of money or other commodity, either by way of straight interest, discount or otherwise, except upon writ-

ten contracts wherein, by express agreement, a rate of interest not exceeding eight per cent. may be charged: *Provided,* That where any insurance company, as a condition for a loan by such company, of money upon mortgage or other security, shall require that the borrower insure either his life or that of another, or his property, with such company and assign to such company, or cause to be assigned to it, any policy of insurance as security for such loan, or agree to pay premiums thereon during the continuance of such loans, whether such premiums be paid annually or in installments, such premiums shall not be considered as interest on such loan within the meaning of this section, nor shall any loan be rendered usurious by reason of any such requirements where the rate of interest charged for the loan does not exceed the rate above fixed, and where the premiums charged for the insurance do not exceed premiums charged to other persons under like circumstances and conditions who do not obtain loans.

"Sec. 3639. Any person or corporation who shall receive, or contract to receive, as interest any greater amount than is provided for in the preceding section shall forfeit all interest, and the costs of the action and such portion of the original debt as shall be due shall be recovered without interest or costs, and where any amount so charged or contracted for has been actually received by such person or corporation, he or she, or they shall also forfeit double the total amount received in respect of interest, to be collected by a separate action or allowed as a counterclaim in any action brought to recover the principal sum.

"Sec. 3640. No lender shall be charged with usury under the preceding sections by reason of money paid or agreed to be paid others by the borrower in order to obtain a loan where the lender neither took nor contracted to take more than lawful interest: *Provided, however,* That suit may be brought within six months from the date of such transaction against such other persons as may have charged excessive

fees or excessive commissions, and recovery may be had thereon for the excess over and above a reasonable fee or reasonable commissions."

We proceed to the consideration of the first of these propositions, which is as follows: *The payment by the borrower of a commission to the agent of the lender, where it, together with the interest charged, exceeds the lawful rate, cannot be construed usury unless the lender was cognizant of the illegal exaction.*

We have already shown by the testimony that the lender was a party to the illegal and usurious contract, and that the said proposition is, therefore, inapplicable.

The second of said propositions is as follows: *The knowledge of an agent of an illegal exaction by himself, cannot be imputed to the principal as notice thereof, where the agent's act is contrary to law, against the interest of the principal, and for his personal benefit.*

The authorities which we have cited, as well as those cited by Mr. Justice Cothran, show that this proposition cannot be sustained. It is a mistake to suppose that the Bank was not benefited by the fraudulent act of President Brown, as it could not be carried into effect, except by securing a borrower for the Bank, out of whom it made several thousand dollars. See *Brown v. Brown,* 38 S. C., 173; 17 S. E., 452.

The third proposition is as follows: *Assuming that under the law as it stood prior to the Act of 1916 (Code of 1922, Vol. 3, § 3640) the transaction in question may have been judicially declared usurious, at the time of trial the penalty therefor under Section 3639 had been repealed by Section 3640, and was not recoverable.*

Section 3640 consists of two parts, the first of which is as follows:

"No lender shall be charged with usury under the preceding sections by reason of money paid or agreed to be paid others by the borrower in order to obtain a loan where

the lender neither took nor contracted to take more than lawful interest:"

—which means that a lender shall be charged with usury under the preceding sections by reason of money paid or agreed to be paid others by the borrower in order to obtain a loan, where the lender either took or contracted to take more than lawful interest.

Mr. Justice Cothran contends that the part of Section 3640 which we have quoted, repealed the penalty under Section 3639, while, on the other hand, we contend that the repeal only extends to those cases where the lender neither took nor contracted to take more than lawful interest. It is merely an *exemption which, in order to be of any benefit to the lender, must be set up as a defense and established by the testimony.*

The other part of Section 3640 is as follows:

"*Provided, however,* That suit may be brought within six months from the date of such transaction against such other persons as may have charged excessive fees or excessive commissions, and recovery may be had thereon for the excess over and above a reasonable fee or reasonable commissions."

As no question is before the Court, under this part of the section, it has no application to the present case.

It is the judgment of this Court that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for such further proceedings as may be necessary to carry into effect the views herein announced.

MR. ASSOCIATE JUSTICE WATTS, and MESSRS. DEVORE, HENRY, RICE, TOWNSEND, and BONHAM, Circuit Judges, concur.

MESSRS. FEATHERSTONE, SEASE, and SHIPP, Circuit Judges, concur in result.

MESSRS. ASSOCIATE JUSTICES COTHRAN and MARION, MESSRS. ACTING ASSOCIATE JUSTICE R. O. PURDY and

MESSRS. WILSON, DENNIS, MANN, and MAULDIN, Circuit Judges, dissent.

MR. JUSTICE WATTS (concurring) : The following opinion was written by the late Mr. Justice Fraser and concurred in by the Chief Justice and myself. I now adopt it as my opinion in the case:

This was an action to foreclose a mortgage. The defendant set up usury.

The facts, in brief, are: Miss Heyward, the defendant, sent her brother, who was her agent, to the plaintiff Bank to borrow money. The agent negotiated the loan with Mr. Brown, the president of the Bank, who was fully authorized by his Bank to make loans. The contract between Mr. Heyward and Mr. Brown, the president of the Bank, and also a director of the Bank, was that Miss Heyward should pay eight per cent. to the Bank and two per cent. to Brown, personally. This loan went on for years. The eight per cent. was paid to a clerk of the Bank and the two per cent. was paid to the president. These two were to run with the life of the loan. Was it usury? The trial Court held that it was not usury. We think it was usury.

In *Mayfield v. Mortgage Co.*, 104 S. C., 157, 159; 88 S. E., 372, we find:

"(a) When a Court is probing a contract for unlawfulness, the mere name by which it is called does not work an estoppel. It is the substance, and not the name, that governs. There are some cases in this State that have not stated the true test of usury. It does not change the practical result to come back to the true rule, but it tends to confusion to call things by the wrong name. People have the right to make any contract the law does not forbid. A contract may work a hardship on one of the contracting parties; but, unless the law forbids the contract, the Courts of Law must enforce it. People must take care of themselves, or the Legislature must protect them by making the contract unlawful.

"When a litigant goes into a Court of Equity, the Court

may refuse its aid to enforce an unconscionable demand. 'He who seeks equity must do equity.' Neither the Court of Equity nor the Court of Law has the right to take money or any kind of property from one and give it to another, except in obedience to some law. There is no law that forbids or penalizes the charging of an unreasonable commission or an unreasonable fee. An unconscionable commission or fee being paid, there is no remedy at law or in equity. The Courts have, however, the right to uncover the hidden unlawfulness of a contract and declare its true character. A sum of money retained or paid in an attempt to evade the law against usury may be declared to be in fact usurious interest; and, when it is adjudged to be usurious interest, then the law against usurious interest applies, and should be enforced. The practical result is not changed, but it is well to give logical and lawful names to the matters with which we deal. The question for the Court is, was the payment of this fee a cloak to hide usurious interest? If so, the penalty of usury attaches to the transaction. * * *

"Voluntary payment.

"The mere fact that a payment is made voluntarily is not sufficient, because any one may pay usurious interest voluntarily and then bring suit for and recover it. No effective circumstances accompanying this voluntary payment have been relied upon by appellant."

It does not need the citation of authority to show that a principal is responsible for the tortious acts of his agent, performed within the scope of his authority. The principal is responsible for the unlawful manner in which the agent does an authorized act. It makes no difference by what name a thing may be called, when we are uncovering a violation of the law, but what is its nature. It makes no difference that two checks were made instead of one. In the *Mayfield Case* the fee was so large as to indicate that it was not intended as a fee, only a cloak for usury. In that case there was a basis for the charge of a fee. Here the plaintiff

did not do the law the reverence to even claim that there was a basis of service for which two per cent. was charged. But the contract was that the two per cent. was to continue during the life of the loan. The contract was that the president and a clerk in the Bank should receive ten per cent. for the loan, during the life of the loan, and is usurious. We have seen that even though the payment was voluntarily made, it is immaterial.

If this case is affirmed, the statutes against usury are dead. Any money-lending concern can employ a loan agent who will charge for himself unlimited usury, and no one can show that behind closed doors the money-lender himself not only got his legal eight per cent., but another eight per cent. too.

MR. CHIEF JUSTICE GARY concurs.

MR. FEATHERSTONE, Circuit Judge: I concur in the result of the opinions of the Chief Justice and Mr. Justice Watts, and think the judgment of the Circuit Court ought to be reversed for the following reasons:

The loan was made by the Bank through its president, Mr. Brown, Miss Heyward agreeing to pay eight per cent. to the Bank and two per cent. to the president of the Bank. The record shows that no other officer of the Bank had anything to do with making the contract. In so far as the transaction was concerned, the president was the Bank and his knowledge must be imputed to the Bank.

The general rule beyond doubt is that notice to the agent is notice to his principal, and this rule is probably more stringent in the case of corporations than natural persons.

To this rule there are some well-defined exceptions, but we are concerned with the facts in the present case, which, in my opinion, do not place it within any of the exceptions to the general rule.

The Circuit Judge relied upon some South Carolina cases, which do not seem to me to control.

In *Akers v. Rowan,* 33 S. C., 451; 12 S. E., 165; 10 L. R. A., 705, it was sought to charge the bank with the knowledge of Col. Sloan, one of its directors and its attorney, which knowledge he had obtained while acting as attorney for one Robbins, which the Court said could not be done. Col. Sloan was not acting for the bank, and the Court said he could not have imparted the information without a breach of duty to his client.

In *Rapley v. Klugh,* 40 S. C., 150; 18 S. E., 680, the Court held that the knowledge of the president acquired in the purchase of land conveyed to the corporation, and afterwards conveyed by it to the president and another, must be imputed to the grantees of the bank.

In *Knobelock v. Bank,* 50 S. C., 259; 27 S. E., 962, Jacob Small was president of the bank and committed a breach of trust, drawing out certain funds, which were on deposit in his name as Trustee, and it was sought to hold the bank responsible. The Court, speaking through Mr. Justice Jones, said:

"The seventh exception alleges error in the refusal to charge plaintiff's eighth request to charge. This request to charge, as we understand it, was that if Small dealt with the bank as to this deposit ostensibly as a Trustee, but secretly as an individual, his knowledge of his own fraudulent intent, with reference to this deposit is imputable to the bank of which he was president. We are unable to see the merit of this distinction. The question was not whether Small was acting for himself as trustee, or for himself as an individual, but whether, in the transaction of drawing out the deposit, he was in any way acting for the bank. Knowledge of Small's fraudulent intent with reference to the deposit was not imputable to the bank, unless, in the particular transaction of paying out and receiving the deposited money, Small acted for the bank."

Again, Mr. Justice Jones said:

" 'That in order to charge a bank with notice of the facts of which its president or other officer has knowledge in reference to a transaction, he must have acted in the transaction on behalf of the bank,' to which the Judge added, 'if he was acting either wholly or partially for the bank.' When, therefore, he qualified the request under consideration, he meant to correct it in the same particular. The expression, 'knowledge of an agent of a corporation or other principal, while engaged in a fraud for his own benefit,' without explanation, might have been supposed by the jury not to exclude any participation by the principal in the profits of the fraud; hence the Judge, to avoid such impression, added the qualifying words, thereby making it clear to the jury that knowledge of an agent while engaged in a fraud for his own benefit, in which the principal is not in any way a participant, cannot be imputed to the principal. Participation by the principal in the fruits of the agent's fraud is not the test whether the agent's knowledge is imputable to the principal, but it affords evidence on the question whether the agent in the fraudulent transaction was acting within the scope of his agency previously authorized or subsequently ratified, which is the test."

A careful reading of the entire opinion in the *Knobelock Case* will reveal that it is not controlling in the case now under consideration.

In none of the cases decided by our Court has it been held that the notice of the agent must not be imputed to the principal where he was acting solely for the principal with reference to the transaction in which the knowledge was obtained.

In 2 Pomeroy's Equity (4th Ed.), § 675, the author says:

"The Courts have carefully confined the operation of this exception to the condition described where a presumption

15—S. C.—135.

necessarily arises that the agent did not disclose the real facts to his principal, because he was committing such an independent fraud that concealment was essential to its perpetration; it has never been extended beyond these circumstances.   It follows, therefore, that every fraud of an agent in the course of his employment, and in the very same transaction, does not fall within this exception; and, most emphatically, it does not apply when the agent's fraud consists merely in his concealment of material facts within his own knowledge from his principal."

Again, in Section 676, the same author says:

*"True Rationale of the Rule—Based Wholly Upon Policy and Expediency.*—The rule of constructive notice through agent to principal, like the doctrine of constructive notice in general, must find its ultimate foundation and only support in motives of policy and expediency.   It will not aid us in the least to inquire whether it should be derived from the notion that the agent is identical with the principal—is the principal's *alter ego*—or from the notion that the principal cannot be allowed to acquire and retain a benefit through means of an act or proceeding which his agent knew to be wrong.   The true rationale is, as I have already shown, that the agent's knowledge of material facts—not necessarily of the ultimate facts—or what the law assumes to be his knowledge, must always, from considerations of expediency be regarded and treated as the principal's knowledge; otherwise the business affairs of society could not be safely transacted.   Whenever the knowledge of the agent is actual—that is, whenever he has obtained actual information of certain facts, and has, therefore, received actual notice—this imputation of his knowledge to the principal is evident and reasonable.   Whenever the agent's knowledge of certain facts facts exists only in contemplation of law—that is, when he has received a constructive notice—the imputation thereof to the principal is no less reasonable and clear.   If, under any circumstances, a party,

while dealing for himself, must be treated, in contemplation of law, as one who has acquired certain information, and must be charged with constructive notice thereby, the same result must follow when, under like circumstances, the party is dealing by means of an agent. If that assumed information called constructive notice shall affect a party acting for himself, it should equally affect him acting through an attorney. As the doctrine is thus based entirely on motives of policy, it should never in its application transcend the scope and limits of those motives. Whenever its operation in a given state of facts would produce manifest injustice, the Courts should, if not absolutely compelled to express authority, withhold such operation. A tendency to restrict the doctrine—to confine it within the limits already established—is clearly exhibited by many of the recent decisions. Some of the ablest Judges now on the English bench have even expressed a strong dissent from the doctrine itself, in some of its phrases and applications, especially where a principal is charged with notice of information acquired by his agent in a former transaction, and which such agent is assumed to have remembered. The English cases in which this branch of the rule commonly arises are more frequent, involve a different condition of circumstances, and are consequently much more harsh in their effects, than the analogous class of cases which come before the American Courts."

In *McCaskill Co. v. United States,* 216 U. S., 514; 30 S. Ct., 391; 54 L. Ed., 596, the Court said:

"Undoubtedly a corporation is, in law, a person or entity entirely distinct from its stockholders and officers. It may have interest distinct from theirs. Their interests, it may be conceived, may be adverse to its interest, and hence has arisen against the presumption that their knowledge is its knowledge, the counter presumption that, in transactions with it, when their interest is adverse, their knowledge will not be attributed to it. But while this presumption should

be enforced to protect the corporation, it should not be carried so far as to enable the corporation to become a means of fraud or a means to evade its responsibilities.  A growing tendency is, therefore, exhibited in the Courts to look beyond the corporate form to the purpose of it, and to the officers who are identified with that purpose.   Illustrations are given of this in Cook on Corporations, §§ 663, 664, and 727.   The principle was enforced in this Court in *Simmons Creek Coal Co. v. Doran,* 142 U. S., 417; 12 S. Ct., 239; 35 L. Ed., 1063.  In that case a corporation claimed title to land through a deed of its corporators, one of whom became its president.  Of the effect of this the Court said: 'Associated together to carry forward a common enterprise, the knowledge or actual notice of all these corporators and the president was the knowledge or notice of the company; and, if constructive notice bound them, it bound the company.' "

In the notes to *Brookhouse v. Publishing Co.,* 2 L. R. A. (N. S.), 993, the annotator says that Mr. Pomeroy probably lays the rule down a little too broadly, but on page 994 he (the annotator) says:

"There is, however, good authority, if not the weight of authority, in favor of a qualification of the foregoing exception so as to exclude therefrom, and, therefore, to bring within the general rule which charges the principal with knowledge possessed by the agent, cases where the officer, though he acts for himself or for a third person, is the sole representative of the corporation in the transaction in question.   None of the cases above cited expressly denies, and few of them are necessarily inconsistent with, the existence of such qualification to the exception; and some of them— e. g., *English-American Loan & T. Co. v. Hiers,* 112 Ga., 823; 38 S. E., 103.  *National Bank v. Feeney,* 9 S. D., 550; 70 N. W., 874; 46 L. R. A., 732, and *Commercial Bank v. Burgwyn,* 110 N. C., 267; 14 S. E., 623; 17 L. R. A., 326— expressly admit the qualification.  By reason of such quali-

fication the application of the exception was denied in *Brobston v. Penniman,* 97 Ga., 527; 25 S. E., 350, holding that a bank was chargeable with knowledge of its president and cashier, that the proceeds of the note of a firm, of which they were members, were to be used for their private purposes, and not for the purposes of the firm, they having represented the bank in making the loan and taking the note. So, in *Morris v. Georgia Loan, Savings & Banking Co.,* 109 Ga., 12; 34 S. E., 378; 46 L. R. A., 506, where the cashier of a bank, as an individual, had an interest in a promissory note which he knew was given without consideration, and, as cashier, discounted the note without reference to, or consultation with, any other officer of the bank, it was held that the bank was not a *bona fide* purchaser of the note, without notice. The case of *English-American Loan & T. Co. v. Heirs, supra,* was distinguished from the last two cases upon the ground that the person whose knowledge was sought to be charged to the bank was merely a director, and had no active participation in the management of the bank's affairs. In *Black Hills National Bank v. Kellogg,* 4 S. D., 312; 56 N. W., 1071, it was held that the knowledge of the cashier of a bank as to defenses against a promissory note made to him in his individual capacity, and by him transferred to the bank, was chargeable to the bank, it appearing that he transacted the business in behalf of the bank. The case of *National Bank v. Feeney, supra,* was subsequently distinguished upon the ground that the cashier in that case was not a member of the discount committee by which the loan was made. In *Steam Stonecutter Co. v. Myers,* 64 Mo. App., 527, the Court said, in effect, that the rule that where an officer of a corporation deals with it in his individual capacity the corporation is not chargeable with his uncommunicated knowledge of facts affecting the validity of the transaction, does not apply where the officer is acting for the corporation as well as himself, and distinguished the case of *Merchants' National Bank v. Lovitt,* 114 Mo., 520; 21

S. W., 825; 35 Am. St. Rep., 770, *supra,* upon the ground
that in that case one officer of the corporation, acting as
an individual, dealt with another officer, representing the
corporation. The foregoing qualification of the exception
is also supported by *Witter v. McCarthy,* 5 Cal. Unrep.,
267; 43 P., 969. *Barksdale v. Finney,* 14 Grat. (Va.),
338, *Smith v. Wilson & B. Savings Bank,* 1 Tex. Civ. App.,
115; 20 S. W., 1119; and *Anderson v. Kinley,* 90 Iowa,
554; 58 N. W., 909."

*Lea v. Mercantile Co.,* 147 Ala., 421; 42 So., 415; 8
L. R. A. (N. S.), 279; 119 Am. St. Rep., 93, is a strong
case in point, and the Court held that the corporation must
take knowledge of the information possessed by one Riddle,
its agent. Some parts of Judge Tyson's opinion are perti-
nent here and, to my mind, unanswerable. Thus, on page
98 of 119 Am. St. Rep.; 147 Ala., 428; 42 So., 417:

"It is, in effect, conceded that Riddle did have the fullest
notice; but it is insisted that his knowledge was not acquired
in the course of his agency for or management of the com-
plainant corporation, and, therefore, his knowledge cannot
affect the rights of that company. Conceding the soundness
of the insistence in a proper case, it is but a rule of evidence,
and has its limitations. Under the facts of this case, the rule
has no application, and, therefore, can exert no influence in
its decision. Here Riddle was personally interested and con-
cerned in the agreement by which the debt now sought to be
collected originated. Besides, he was the sole manager and
controller of the creditor company at his will—its *alter
ego*—and, it seems, was it sole stockholder but one, the
other being a nonresident. Indeed, it is difficult to consider
him as other than the creditor corporation itself, so com-
pletely were the affairs of it subject to his will and under
his immediate control. But in this particular transaction he
acted both for himself and for his company. The result of
that transaction was the acquisition by him personally of
$30,000 of bank stock and the note for his company evi-

dencing the loan, and of some $90,000 of collateral. All of this he and his comány acquired as part of the consideration for making the loan, constituting the debt which his corporation is now attempting to collect by this proceeding. So, then, we must look upon Riddle in two capacities—one as an individual, and the other as manager of his company. Riddle, as an individual, and Riddle, as manager, are found entering into a joint transaction for their joint benefit with the agent of the Piedmont Land & Improvement Company, with full legal knowledge of the details of the organization of that company. In short, he as an individual and as manager co-operated in doing an act for their joint interest. As to this particular act or transaction they became as one person, and the knowledge of the one must be imputed to the other. For Riddle as an individual and Riddle as general manager òf his corporation could not do a single act for their mutual benefit from different standpoints. It would be a psychological impossibility for him to have had a different consciousness respecting the affairs òf the debtor corporation, as general manager of his company, from what he had individually; and so we hold that as general manager he had the same familiarity with the affairs of the debtor company that he undoubtedly possessed individually. *Anderson v. Kinley,* 90 Iowa, 554; 58 N. W., 909. *Huron Printing & B. Co. v. Kittleson,* 4 S. D., 520; 57 N. W., 233."

Again, on page 99 of 119 Am. St. Rep.; 147 Ala., 430; 42 So., 418, he said:

"Suppose Riddle had acquired the knowledge while manager of his company, in a transaction for it prior to the one here involved, and desired to communicate it to his corporation, to whom would he have commmunicated it? He was, as we have said, to all intents and purposes the corporation itself. It could be nothing but the sheerest nonsense to say that as agent he should communicate the knowledge to himself as the managing representative of his corporation. Since the corporation could acquire notice in no other way

than by and through its managing head or officer, it will scarcely be doubted that notice to such officer is of necessity notice to it."

See, also, notes to *Lilly v. Hamilton Bank,* 29 L. R. A. (N. S.), 561, 562, and 563. Also, *First National Bank v. Burns,* 88 Ohio St., 434; 103 N. E., 93, and notes; 49 L. R. A. (N. S.), 764. These cases hold that the knowledge of agent must be imputed, when he is sole representative. See, also, 2 C. J., 870.

A very illuminating reason for the rule that notice to the agent is notice to the principal is found in *Machine Co. v. Furniture Co.,* 174 Ala., 190; 56 So., 726; L. R. A. 1918B, 924. Said the Court:

"Constructive notice to the principal through the actual knowledge of the agent is not a rule of evidence, but one of substantive law. Given notice to or knowledge of the agent, received while so acting, and the principal is conclusively bound by it; not because he ever knows it in fact, because his actual knowledge is utterly immaterial, but because as to the thing which the agent is doing the agent is in law the principal, and the principal is in law the agent. Their legal identity is complete. Nor can it matter, in this aspect of the rule, whether the agent has or has not, private reasons or interests which make it unlikely or even certain that he will not inform his principal."

In the case at bar, Brown, who made the trade with Miss Heyward, was the Bank. What he knew the Bank knew. If he had wanted to impart the information to the Bank, to whom would he have imparted it? Would he have had to say: "I, as an individual, hereby notify myself, as president, that I have made a usurious contract with Miss Heyward?"

*Atlantic Mills v. Ind. Orchard Mills,* 147 Mass., 268; 17 N. E., 496; 9 Am. St. Rep., 698, is a strong case in point. There Gray was the agent of the corporation sought to be

charged with notice. At page 700 of 9 Am. St. Rep.; 147 Mass., 273; 17 N. E., 501, the Court said:

"It is true that no officer of the plaintiff besides Gray knew of the fraudulent origin of these checks; but in the very transaction of receiving them, the plaintiff was represented by Gray, and by him alone, and is bound by his knowledge. * * * There was no transaction whatever between Gray and the plaintiff in respect to the transfer of this money, in which the plaintiff was represented, either in whole or in part, by any other person than by Gray; and, therefore, * * * plaintiff must be deemed to have had knowledge of the true ownership, because, in receiving the funds, it acted solely through Gray's agency. It must be deemed to have known what he knew, and it cannot retain the benefit of his act without accepting the consequences of his knowledge."

Again (at page 707 of 9 Am. St. Rep; 147 Mass., 280; 17 N. E., 505):

"It cannot adopt so much of Gray's act as was beneficial, and reject the rest."

So the Bank in the present case is seeking to recover upon a contract made through Brown, its agent, which it cannot do without taking it along with his knowledge.

The case of *Curtis, C. & H. Co. v. United States,* 262 U. S., 216; 43 S. Ct., 570; 67 L. Ed., 956, is a strong case in point. Chief Justice Taft said, page 960 of 67 L. Ed.; 262 U. S., 224; 43 S. Ct., 573:

"In the case at bar, Holbrook was the sole agent acting for the company in securing titles to land for it. It is true that the more titles he got the more profit he would make out of the agency, and we may assume that, as between him and the company, in securing fraudulent titles for the company, he was violating his instructions; but he and the company were in a common adventure, and if the company insists on retaining the fruits of that adventure, it must be

charged with the knowledge of the agent through whom the fruits came."

*First National Bank v. Burns,* 88 Ohio St., 434; 103 N. E., 93; 49 L. R. A. (N. S.), 764, is one of the best considered cases to be found on the subject. Nearly all of the cases on the subject are discussed. The syllabus is as follows:

"A corporation can act only through its officers and agents, and the knowledge of such officers and agents in the transaction of the corporation's business within the scope of their authority becomes at once the knowledge of the corporation without any actual or presumptive communication from agent to principal.

"Where the officer is acting both for himself as an individual and as manager of a banking corporation in the purchase of a note from himself by the Bank, and his action in that behalf is adopted and ratified by the Bank, the manager's knowledge *as a man* is equally his knowledge as manager of the Bank. He cannot *unknow* as manager what he knows as a man. To hold otherwise would be to promote fraud rather than prevent it." (Headnotes by the Court.)

Some of Judge Wannamaker's remarks are very striking, and they seem to me unanswerable. In 49 L. R. A. (N. S.), ot the bottom of page 768 (88 Ohio St., 422; 103 N. E., 95), quoting from Mechem on Agency:

"Whatever notice or knowledge, then, reaches the agent under these circumstances (matters within the scope of his authority), in law reaches the principal."

Judge Wannamaker proceeds:

"This case is distinguishable from many of those cited in the plaintiff in error's brief, for several reasons. The agency of Boesel as president and active manager of the Bank, is admitted; second, what he did as such agent was fully authorized by the Bank. This is conclusively established by the fact that the Bank at no time repudiated the transaction or questioned the agent's authority, but, on the

contrary, continued to hold said notes, brought suit upon them, and is now prosecuting error for a reversal of the judgment below.   Again, in this case it is admitted not only that Boesel as president and active manager of the Bank was fully authorized as such to purchase the notes, but that no other person, officer, committee, or board of directors needed to take any action whatsoever to complete such purchase.   Again, this is a case in contract, whereas many of the cases cited are those of tort."

Again, says Judge Wannamaker, in 49 L. R. A., (N. S.), at page 770 (88 Ohio St., 445; 103 N. E., 96):

"In *First National Bank v. Blake* (C. C.), 60 F., 78: "A large number of cases are cited in support of this view, and it is well settled that an officer or agent, dealing with a corporation or his principal on his own account, is not presumed to communicate knowledge which it would be to his interest to conceal, and the corporation or principal is not chargeable with such knowledge.   But there is no room for the application of this principle where the agent is the sole representative of both parties in the transction.   If Cornish was the sole representative of the Bank in the transaction with himself, there was no one from whom information could have been concealed, or to whom it could have been communicated.   If he was the sole representative of each party, each must have had equal knowledge."

"To hold otherwise," said Judge Wannamaker, "would open the widest possible door for all sorts of fraud; the more atrocious and aggravated the fraud, the less the likelihood of fixing the liability upon the principal.   Why?   Because the agent would be the less likely to communicate the fact to the principal.   Such a holding has no place in sound business or good morals and ought not to be encouraged by our Courts."

It may be also said that Brown's conduct was not fraudulent.   The Bank was satisfied to get eight per cent.   Therefore, it was no fraud on the Bank for Brown to get the two

per cent. He was not defrauding the Bank out of one cent. He was not engaging in a transaction which would necessarily result in injury to the Bank, for Miss Heyward was not bound to plead usury; it was a personal right with her; she could or could not, as she chose.

In the opinion of Mr. Justice Cothran, the position is taken that the Act of 1916, now Section 3640, Code 1922, repealed the penalty for the violation of the Usury Law, in so far as the present case is concerned, and that, therefore, although the contract was made before 1916, the Court cannot apply the penalty. In answer to this position, it is sufficient to say that Section 3640 is not the section which fixes the penalty. That is done by Section 3639. It cannot be contended that the Act of 1916 repealed Section 3639. It does not undertake to do so. Therefore, the section which fixes the penalty and which covers all cases of usury, is still in existence.

It is true that where an Act fixing a penalty is repealed, there can be no punishment inflicted, even though the provisions of the Act were violated before the repeal. This is true where a criminal statute has been violated and a conviction is had after the repeal of the statute creating the offense and fixing the penalty. The reason for that is obvious: There is no power left to impose the penalty. A complete answer, it seems to me, to the position of Mr. Justice Cothran, is the statement that the section (3639) prescribing the penalty for usury was never repealed. That section condemns all usurious transactions and provides a penalty therefor.

Again, Section 3640, by its express terms, provides that—

"No lender shall be charged with usury under the preceding section, by reason of money paid or agreed to be paid others by the borrower in order to obtain a loan, where the lender neither took nor contracted to take more than lawful interest."

This Act (1916) clearly defines what should not constitute usury, in a given state of facts. It did not undertake to repeal the usury statute, but, on the contrary, expressly refers to and recognizes Section 3639. Under these circumstances, all of the authorities quoted by Mr. Justice Cothran manifestly have no application.

Next, does Section 3640 relieve the Bank from liability for usurious interest received, on the contract made before the passage of the Act of 1916?

It is a rule of statutory construction that all statutes are to be construed as having only a prospective operation, unless the purpose and intention of the Legislature to give them a retrospective effect is expressly declared, or is necessarily implied from the language used. This rule is so universal and thoroughly understood that it is useless to cite authority to support it. The reader will search in vain to find any expression in the Act of 1916, which will make it operate retrospectively. We must, therefore, read it as referring only to transactions occurring after its adoption and approval.

For these reasons, I think that the judgment should be reversed.

Mr. SHIPP, Circuit Judge, concurs.

Mr. JUSTICE COTHRAN (dissenting): The action is for the foreclosure of five mortgages, executed by the defendant to the plaintiff Bank, to secure the payment of certain bonds dated and in amounts as follows:

| | |
|---|---:|
| March 20, 1912 | $ 4,000.00 |
| April 18, 1913 | 600.00 |
| November 2, 1915 | 950.00 |
| April 1, 1916 | 700.00 |
| May, 1916 | 770.00 |
| Total | $ 7,020.00 |

The bonds call for eight per cent. interest and ten per cent. attorneys' fees. The several loans enumerated were consoli-

dated on the books of the Bank and carried as one loan, totaling $7,020 on May 24, 1916, the interest upon which has been paid up to November 24, 1919; the balance claimed to be due being $7,020, with interest at eight per cent. from that date.

The complaint was in the usual foreclosure form. The defendant set up the claim of usury, in that "the said plaintiff, Citizens' Bank, through its officers and agents, contracted to receive as interest from this defendant, upon the several debts evidenced by the several bonds and mortgages set out in said complaint, a greater amount than eight per cent. per annum, to wit, ten per cent. per annum"; that the interest so received upon said loans up to November 24, 1919, amounted to $4,382.61; that the penalty, double the amount of interest, amounts to $8,764.22; that she is entitled to set that amount off against the principal of the loans, $7,020, leaving due by the Bank to her the difference, $1,744.22, the basis of a counterclaim interposed by her.

The South Carolina Loan & Trust Company made a party holding a junior mortgage, was awarded judgment for $3,750 with interest at eight per cent. per annum from November 1, 1922, and ten per cent. attorneys' fees. No objection has been interposed to this judgment and that Bank passes out of the appeal.

The transactions between the plaintiff Bank and the defendant, Miss Heyward, began with an application by Mr. Nat. Heyward, brother of Miss Heyward, and acting for her for a loan of $4,000. He negotiated with C. R. I. Brown, president of the Bank, and the loan by the Bank to Miss Heyward was consummated by an agreement by Nat. Heyward as her agent to pay during the life of the loan eight per cent. per annum interest to the Bank, and two per cent. commissions personally to the president. The interest at eight per cent. was paid at stated intervals to the Bank, and the commissions of two per cent. to Brown. The payments were handled separately, the commissions

being regularly paid to Brown for his personal use and
benefit, unknown, unauthorized, and unratified by the Bank.

The case was referred to Master Harvey simply to take
and report the testimony, which he did. Upon the coming
in of his report, the case was heard by his Honor, Judge
Johnson, of the Fourteenth Circuit. He filed a decree dis-
allowing the defense and claim of usury, and ordering fore-
closure. From his decree the plaintiff has appealed, sub-
stantially raising the several questions hereinafter consid-
ered. Upon a division of the members of this Court, the
appeal was duly heard upon reargument before the Court
*en banc,* consisting of five members of the Court and twelve
Circuit Judges. By a record vote of ten to seven, the
opinion of the Chief Justice was approved, reversing the
decree of Judge Johnson and holding that the transaction
was infected with usury.

The result of that decision, if allowed to stand, is as
follows: The mortgagor, who has received and spent
$7,020 of the Bank's money, is relieved entirely of her ob-
ligation to return it, and is allowed, upon her counterclaim,
$1,744.22. That is to say, the amount received by the Bank
"in respect of interest" is $4,382.11; double that sum is
$8,764.22, the penalty allowed the mortgagor. That is sub-
ject to a credit of the principal of the debt, $7,020, leaving
the Bank in debt to the mortgagor $1,744.22.

The effect upon the finances of the Bank is that it loses:

The principal of the debt ....................$ 7,020.00
Interest upon it from November 24, 1919 to Jan-
     uary 1, 1926 ......................... 3,427.32
The counterclaim .......................... 1,744.22

Total loss ...........................$12,191.54

Since the institution of this action, the Bank has become
insolvent; it has been taken over by the State Bank Exam-
iner, and its affairs are now in process of liquidation. The
above loss of more than $12,000 will, therefore, fall upon

the stockholders, depositors, and other creditors, who had not the slighest participation in or knowledge of the wrongful conduct of the president, or in the fruits of it, for which they are held responsible upon the most strained, and, as I think, erroneous, application of technically constructive law.

That the conduct of the president of the Bank was reprehensible, contrary to law, against the interest of the Bank, violative of his solemn trust to the creditors, depositors, and stockholders of the Bank, and in his own interest, for his personal benefit, no one will attempt to deny; but is it reasonable that this loss should fall upon the innocent creditors, depositors, and stockholders, rather than upon a conspirator in the nefarious transaction, who has received and spent more than $7,000 of the Bank's money?

As quoted by the Supreme Court of the United States in *Fowler v. Trust Co.,* 141 U. S., 384, 403; 12 S. Ct., 1, 6 (35 L. Ed., 786) :

"The law does not favor forfeitures, and in such cases the Courts hold to a rigid and strict compliance with the law imposing the penalty."

The decree of Judge Johnson should be affirmed for the following reasons:

(1) The payment by the borrower, of an exorbitant commission to the agent of the lender, where it, together with the interest charged, exceeds the lawful rate, cannot be construed usury unless the lender was cognizant of the illegal exaction.

(2) The knowledge of the president of a bank making an illegal exaction from a borrower for his own personal benefit, will not be imputed to the bank.

(3) Assuming that under the law, as it stood prior to the passage of the Act of 1916 (Code of 1922, Vol. 3, § 3640), the transaction in question may have been judicially declared usurious, at the time of trial the penalty therefor, under Section 3639, had been repealed by Section 3640, and was not recoverable.

1. The payment by the borrower of an exorbitant commission to the agent of the lender, where it, together with the interest charged, exceeds the lawful rate, cannot be construed usury unless the lender was cognizant of the illegal exaction.

It seems to have been assumed that a charge of two per cent. commissions was an unreasonable and exorbitant one, an illegal exaction. There is no evidence in the case upon this subject,. which was the ground upon which the judgment in the *Mayfield Case,* 104 S. C., 152; 88 S. E., 370, was reversed. I will, however, assume that it was unreasonable, exorbitant, illegal, and that if properly chargeable to the corporation of which Brown was president, was sufficient to infect the transaction with usury. I do not think that there can be a shadow of doubt under the decisions of this Court and all others, that this illegal exaction cannot be charged up against the lender unless he was cognizant of the fact.

The case of *Brown v. Brown,* 38 S. C., 173; 17 S. E., 452, is interesting and instructive; it is admittedly a case of first impression in the State upon the point at issue. In that case the question was whether the exaction by an agent of $1,500 commissions upon a loan constituted usury. The record shows that that question was to be solved upon the further question whether the lender had notice of the exaction. The American Freehold Land Mortgage Company, an English corporation, was the mortgagee-lender; they had a business connection with Corbin Banking Company of New York City, who placed loans for their clients; the latter operated in South Carolina through W. H. Duncan, an attorney at Barnwell. The mortgagor, John A. Brown, applied to Duncan for a loan of $7,500, and signed the usual application appointing Duncan his agent to negotiate the loan, and agreeing to pay him $1,500 commissions for his services. All of the papers, note, mortgage, and application (showing the agreement to pay Duncan the commissions stated),

16—S. C.—135.

were forwarded by Duncan to the Corbin Banking Company, and after some delay the loan was perfected and the money, $7,500, sent to Duncan, who paid off certain incumbrances upon the mortgaged premises, retained $1,500 for his agreed commissions, and held the balance, about $1,500, for the estate of Brown, who had died in the meantime. In the settlement of Brown's estate the defense of usury was interposed against the mortgage. The Court said:

"The above agreement [that is, to pay commissions to Duncan] was a part of the original application for the loan, which was forwarded and accepted, and the papers drawn in accordance with it were sent back and signed. Now, the question is, did this contract to pay the $1,500 make the loan usurious as to the mortgagees, who were the actual lenders? * * * We think the weight of authority makes that depend upon the question of fact, whether the contract to pay an excessive and unreasonable amount, * * * was known to those who furnished the money upon it. If they knew the facts when the proposition was made and accepted, the loan will be held to be usurious"—citing cases.

The Circuit Judge had held that both Duncan and Corbin Banking Company were the general loan agents of the mortgage company, "and that they had actual knowledge of the usurious exaction and participated therein." The Supreme Court said:

"Whether the mortgagees did or did not derive benefit, directly or indirectly, from the $1,500, which was not a reasonable or proper charge for any services rendered, we cannot doubt that they had knowledge that such contract had been made, when they accepted the terms proposed, and remitted the money."

It will be observed that the Supreme Court did not concur in the finding of the Circuit Judge that the mortgagees had participated in the unlawful exaction, but held that regardless of this fact, if they had knowledge of it, which they

found as a fact, the contract was usurious. This decision appears to be based upon the fact not only that the lender had notice of the exaction, but that as a fact such exaction was unreasonable under the circumstances. In other words, that if the commissions charged by Duncan had been a reasonable compensation for his services, the contract would not have been usurious, although the mortgagee may have had express notice of the exaction; for the Court specifically states:

"One who negotiates a loan of money may properly be allowed reasonable compensation for his expenses and trouble, in addition to interest."

This is clearly brought out in the dissenting opinion of Chief Justice McIver, and the principle appears to be recognized in the later cases, particularly *Mayfield v. Mortgage Co.*, 104 S. C., 152; 88 S. E., 370, where it is said:

"It was not denied that the borrower could be required to pay a reasonable fee without violation of the statutes against usury."

In an exceedingly strong dissenting opinion, worthy of that great Judge, Chief Justice McIver, he takes the position that the transaction does not constitute usury, unless the lender not only had knowledge of the illegal exaction but participated in the benefits accruing therefrom.

Personally, the writer of this opinion approves the doctrine disclosed in the dissenting opinion, and thinks that the case of *Brown v. Brown*, so far as the leading opinion is inconsistent therewith, should be overruled. The proposition that an intermediary has the right without affecting the original contract with usury, to charge a reasonable sum as compensation for his services in negotiating a loan, regardless of whether the lender was cognizant of the exaction or not, and regardless of whether the lender participated in the benefits accruing from such exaction or not, is fundamentally unsound, for if the lender knew of the exaction, and was to participate therein, or subsequently

did so, it would be entirely immaterial whether the charge was reasonable or otherwise; in either event, the lender would have received more than the legal rate. *Fowler v. Trust Co.,* 141 U. S., 384; 12 S. Ct., 1; 35 L. Ed., 786.

I think, therefore, that the test prescribed by Chief Justice McIver is the simplest and best, namely, that the agreement for commissions to be paid to an intermediary does not taint the contract with usury, unless the lender is to participate in or is to receive some substantial benefit therefrom. But so far as the present case is concerned, it is not at all material whether the Court should now adopt the majority or the minority opinion in the *Brown Cose;* and to reduce the points of difference, it will be assumed that the majority rule still obtains.

In *New England Co. v. Baxley,* 44 S. C., 81; 21 S. E., 444, 885, the charge of usury in connection with commissions paid to an intermediary was not sustained, specifically upon the ground that there was no evidence tending to show that the lender knew of the alleged illegal exaction The Justices, other than the writer of the opinion in that case, "concurred in the result," but there is nothing to indicate their recession from the doctrine announced in the *Brown Case.*

In *Mortgage Co. v. Gillam,* 49 S. C., 345; 26 S. E., 990; 29 S. E., 203, the charge of usury in connection with commissions paid to an intermediary was sustained, specifically upon the ground of knowledge on the part of the lender of the alleged illegal exaction. The Court said:

"When the loan was consummated, the Corbin Banking Company deducted commissions amounting to $200, besides other sums hereinafter mentioned. This was done with knowledge on the part of the plaintiff. Under the case of *Brown v. Brown,* 38 S. C., 173; 17 S. E., 452, these facts constitute usury."

In *Mortgage Co. v. Woodward,* 83 S. C., 521; 65 S. E., 739, the Court repeated the principle that knowledge of the

alleged unlawful exaction was the test of usury. They say:

"The receiving of excessive and unreasonable commissions by the agent of the lender with the knowledge, actual or constructive, of the principal, renders the transaction usurious, if such commissions and the interest added exceed the lawful rates" (citing cases).

"The doctrine is well settled and universally recognized, that an agent may lawfully take a reasonable commission or bonus from the borrower for his expenses and services in effecting a loan; and whenever the lender is not privy to the arrangement between the borrower and agent, or in no way participates in the commission or bonus, the transaction will be regarded as free from the taint of usury. * * * If an agent in making a loan of money, accepts from the borrower a bonus beyond the legal rate of interest, such act of the agent will not render the contract usurious, if the bonus was taken without the knowledge of the principal and was not received by him." Tyler on Usury, 170.

The case of *Call v. Palmer*, 116 U. S., 98; 6 S. Ct., 301; 29 L. Ed., 559, is precisely in point. In that case it appears that Call applied to the agent of Mrs. Davidson, the proposed lender, for a loan of $10,000. The agent, Burnham, negotiated the loan from money of Mrs. Davidson which he held for investment, by taking Call's note for $10,000, reserving $2,000 for his services in connection with the loan and paying to Call the difference, $8,000. In the suit against Call it was contended that the reservation of the $2,000 by Burnham infected the note with usury. The Court, in the preliminary statement of facts, says:

"No part of this sum was paid to Mrs. Davidson—she did not know that it had been deducted from the $10,000 lent by her to Call, and she never authorized * * * to lend her money at a greater rate of interest than ten per cent., or to retain any commission or bonus out of the sum lent. In

short, she received no benefit from the usury and had no knowledge of it."

In the opinion of the Court, it is said:

"It is clear, therefore, that Mrs. Davidson [the lender] cannot be charged with taking or reserving usurious interest, unless she was bound by the acts of her agent, Burnham. But she was not so bound. It is settled that, when an agent who is authorized by principal to lend money for lawful interest exacts for his own benefit more than the lawful rate, without authority or knowledge of his principal, the loan is not thereby rendered usurious."

The Court quotes an array of authorities, including the following from *Brigham v. Myers,* 51 Iowa, 397; 1 N. W., 613; 33 Am. Rep., 140:

"When an agent for loaning money takes a bonus or commission to himself beyond the legal rate of interest, without the knowledge, authority, or consent of his principal, it does not affect with usury the loan of the principal."

The Court strikingly concludes the discussion with this remark:

"These decisions seem to be founded on plain principles of justice and right. For when two persons, the agent and the borrower, conspire together and for their own purposes violate the law, how can punishment for their acts be justly imposed on the innocent third party, the lender?"

In *Bank v. Waggener,* 9 Pet., 378; 9 L. Ed., 163, the Court said:

"Where the contract on its face is for legal interest only, there it must be proved, that there was some corrupt agreement, or device or shift, to cover usury; and that it was in the full contemplation of the parties. * * * There must be an intent to take illegal interest."

In *Grant v. Insurance Co.,* 121 U. S., 105; 7 S. Ct., 841; 30 L. Ed., 905, the Court said:

"It is also contended by Grant, that the loans received by him from the plaintiff were upon usurious interest to the

amount of $9,000, and that thereby the entire interest decreed was forfeited. But we are of opinion that the evidence shows that the commissions paid by Grant upon the loans (in which the usury is alleged to have consisted), were not paid to the plaintiff. The plaintiff made no contract for usurious interest nor did it take any."

To the same effect are: *Forbes v. Baaden,* 31 N. J. Eq., 381. *Nichols v. Osborn,* 41 N. J. Eq., 92; 3 A., 155. *Short v. Pullen,* 63 Ark., 385; 38 S. W., 1113. *Sherwood v. Swift* (Ark.), 43 S. W., 507.[1] *McLean v. Camak,* 97 Ga., 804; 25 S. E., 493. *McCall v. Herring,* 116 Ga., 235; 42 S. E., 468. *Gantzer v. Schmeltz,* 206 Ill., 560; 69 N. E., 584. *Brainard v. Prouty,* 66 Minn., 343; 69 N. W., 3. *Babcock v. Murray,* 69 Minn., 199; 71 N. W., 913. *Commonwealth Co. v. Dakko,* 89 Minn., 386; 94 N. W., 1088. *Franzen v. Hammond,* 136 Wis., 239; 116 N. W., 169; 19 L. R. A. (N. S.), 399; 128 Am. St. Rep., 1079. *Clarke v. Havard,* 111 Ga., 242; 36 S. E., 837; 51 L. R. A., 499. *Hughes v. Griswold,* 82 Ga., 299; 9 S. E., 1092. *Gardner v. Ruffner,* 206 Ala., 666; 91 So., 580. *Harvard v. Davis,* 145 Ga., 580; 89 S. E., 740. *Wacasie v. Radford,* 142 Ga., 113; 82 S. E., 442. *Silverman v. Katz* (Sup.), 120 N. Y. S., 790. *Brown v. Jones,* 89 Misc. Rep., 538; 152 N. Y. S., 571. *Testera v. Richardson,* 77 Wash., 377; 137 P., 998. See, also, the vast array of citations in note to 19 L. R. A. (N. S.), 391, sustaining the proposition.

"Money paid to a mortgagee's agent, in pursuance of an agreement between such agent and the mortgagor as compensation for, and as consideration of, procuring the mortgagee's forbearance, no part thereof being received by the mortgagee, cannot be deducted on the foreclosure of the mortgage, as usury." *Forbes v. Baaden,* 31 N. J., Eq., 381.

"In absence of any proof showing that the lender of money received any of the commissions which an agent

---

[1] Reported in full in the Southwestern Reporter, not reported in full in 64 Ark., 662.

charged for procuring a loan, the defense of usury will be overruled." *Nichols v. Osborn,* 41 N. J. Eq., 92; 3 A., 155.

"A trust deed given to secure a loan is not void for usury by reason of commissions retained by the agent of the lender, if the lender had no knowledge of the commission." *Sherwood v. Swift* (Ark.), 43 S. W., 507.[1]

"Where a husband makes a loan of his wife's money as her agent, and, besides a note made to her for the principal [sum], with interest at the full legal rate, takes also a commission for himself, without her knowledge or consent, the loan is not usurious." *Short v. Pullen,* 63 Ark., 385; 38 S. W., 1113.

"A loan is not rendered usurious by the fact that the agent of the lender, without his knowledge or consent, exacts from the borrower a bonus for his service in addition to the highest legal rate of interest, which the contract reserves for the benefit of the lender." *Franzen v. Hammond,* .136 Wis., 239; 116 N. W., 169; 19 L. R. A. (N. S.), 399; 128 Am. St. Rep., 1079.

"Although the maximum legal rate of interest was reserved upon a given loan, the mere fact that the lender's agent charged the borrower an additional sum as a commission for making the loan did not render the transaction usurious as to the lender, when he did not authorize such charge, had no knowledge of the same, and did not share in the commission." *McLean v. Camak,* 97 Ga., 804; 25 S. E., 493.

"If agent of lender deducts fees which in addition to rate of interest and other charges make more than eight per cent. during time of loan, but lender did not authorize charge, and had no knowledge of it, transaction would not be usurious as to lender." *Harvard v. Davis,* 145 Ga., 580; 89 S. E., 740.

"A reservation of broker's commission above the legal rate of interest does not taint the transaction with usury, even if the broker is the agent of the lender, unless it is

made with the knowledge of the lender or unless the lender ·derives some benefit therefrom in addition to the lawful interest." *Gardner v. Ruffner,* 206 Ala., 666; 91 So., 580.

"According to the decided weight of authority, had Tallman been a direct and immediate agent of the lender, his receiving for his own use and benefit commissions from the borrower, without authority from or knowledge of the lender, would not infect the loan with usury." *Hughes v. Griswold,* 82 Ga., 299; 9 S. E., 1092.

In *Clarke v. Havard,* 111 Ga., 242; 36 .S. E., 837; 51 L. R. A., 499, the plea of usury was sustained upon the specific ground that the lender had knowledge of the fact that its agent had collected commissions which added to the interest charged exceeded the legal rate.

"A charge of a commission to the borrower by the agent of the lender without the lender's knowledge or participation, as a private matter between the agent and the borrower did not make the loan usurious as to the lender, though the commission in addition to interest was in excess ·of the legal rate." *Franzen v. Hammond,* 136 Wis., 239; 116 N. W., 169; 19 L. R. A. (N. S.), 399; 128 Am. St. Rep., 1079.

"When an agent makes a usurious exaction, solely for his own benefit without the knowledge, authority or sanction of his principal, and without reason on the part of the principal to anticipate such conduct on the part of the agent, he is not affected by such illegal action, if he has not received any benefit therefrom or ratified it." *Commonwealth Co. v. Dakko,* 89 Minn., 386; 94 N. W., 1088.

"The fact that an agent who loaned money of his principal at the maximum rate of interest retained a commission out of the proceeds of the loan did not require a finding of usury where the commission was retained without the knowledge or consent of the principal and he received no benefit from it." *Brainard v. Prouty,* 66 Minn., 343; 69 N. W., 3. *Babcock v. Murray,* 69 Minn., 199; 71 N. W., 913.

"Where a broker negotiated a loan of his client's money at the full legal rate of interest, and charged the borrower commissions for obtaining the money, which commissions were not received either in whole or in part by the lender, the loan was not thereby rendered usurious." *Gantzer v. Schmeltz,* 206 Ill., 560; 69 N. E., 584.

"When no more than the legal rate of interest is reserved on a loan, that the lender's agent charged the borrower a commission, will not render the transaction usurious, if the lender did not authorize such charge nor share in the commission." *McCall v. Herrin,* 118 Ga., 522; 45 S. E., 442.

"Though the maximum legal rate of interest was reserved on a loan, the mere fact that the lender's agent charged the borrower a commission for making the loan did not render the transaction usurious as to the lender, when he did not authorize the charge and had no knowledge of the same, and did not share in it." *McLean v. Camak,* 97 Ga., 804; 25 S. E., 493.

"Knowledge of agent procuring loan of collection of brokerage fee amounting with interest to more than eight per cent. will not be imputed to lender." *Harvard v. Davis,* 145 Ga., 580; 89 S. E., 740.

"The principle is well established that a bank is not constructively visited with notice of fraudulent acts which its officer would not naturally disclose to it." *Real Estate Co. v. R. Co.,* 191 F., 566; 113 C. C. A., 124.

In *Tatum v. Bank,* 193 Ala., 120; 69 So., 508; L. R. A. 1916-C, 767, it is said:

"There is, however, a well-recognized exception to this general rule of the liability of the principal as for knowledge or notice reaching the agent while acting within the line and scope of his authority  That exception is that the principal is not so chargeable with such notice of the agent when the latter is engaged in committing an independent fraudulent act, and the act or knowledge to be imputed relates to this fraudulent transaction."

Also:

"But this exception has a qualification or limitation as to cases like the one on trial; that is, where the corporation has no other agency or representative in the matter, and the party asserting the knowledge or notice on the part of the corporation is guilty of no negligence or fault in the transaction."

There can be no doubt, therefore, of the proposition that, under the law as declared by this Court and by every other Court, the exaction of commissions by an intermediary, which added to the interest provided for exceeds the legal rate, cannot be held to have tainted the original contract with usury unless it be made to appear that such exaction was with the knowledge actual or constructive of the lender.

In the case at bar the Circuit Judge held that the Bank had no actual notice of the reprehensible action of its president; but it is contended by the defendant that "as Brown, the president and director of the Bank, was the agent of the Bank in making this loan, his knowledge with respect to the commissions is imputable to the plaintiff Bank."

The correctness of this contention will be discussed in the next subdivision of this opinion.

II. The knowledge of the president of a bank that an illegal exaction has been made, implied from his personal act in making it, for his own benefit, cannot be imputed to the bank.

There are, in my opinion, five perfectly valid reasons why the knowledge of Brown, that he had required of the mortgagor an illegal exaction of commissions, cannot be imputed to the Bank to supply the essential element of knowledge, under the case of *Brown v. Brown, supra:*

(1) The act of the president in exacting the illegal commissions was not within the scope of his agency;

(2) The offense of usury is a tort against the borrower;

a principal is not liable for the tort of his agent unless the tort was committed within the actual (not apparent) scope of the agency;

(3) The offense of usury is a tort against the borrower; the rule of imputed knowledge or notice has no application to torts;

(4) The rule of imputed notice will not be extended to one who is in collusion with the unfaithful agent;

(5) The rule of imputed notice will not be applied when the agent, although engaged within the scope of his agency, steps outside of it for the purpose of perpetrating a fraud upon his principal for his own benefit.

As to the first ground, that in exacting the illegal commissions Brown was acting outside of the scope of his agency:

The authority conferred upon the president of the Bank, as its agent, was to negotiate loans at the legal rate. It cannot be presumed, and there is no evidence tending to show, that he was authorized to do more. If he had taken a note showing upon its face an illegal exaction, or if the Bank had received the benefit of any part of it, the situation would have been different, but it seems to me too plain for argument that in charging and collecting for his own benefit an illegal exaction he stepped outside of the scope of his agency.

"An authority to loan money at a legal rate of interest does not include by implication the authority to loan it at an illegal rate. An authority to violate the law will never be presumed. When Danforth exacted, in addition to the ten per cent. interest, which was embraced in the note, something for the benefit of himself, he went outside of the legitimate purposes of his agency; and as Knapp did not authorize it, either expressly or by implication, he should not be affected thereby." *Gokey v. Knapp,* 44 Iowa, 32.

In a note to 19 L. R. A. (N. S.), 391, it is said:

"It has been held that a loan is not rendered usurious by

the lender's agent charging the borrower, for his own bene-
fit, a commission or bonus for procuring the loan, in excess
of the highest legal rate of interest, where the commission
was charged without the lender's knowledge or consent, and
there were no circumstances to charge him with such knowl-
edge; the Court saying that, in making such charge, the
agent was acting in his own individual capacity, for it will
not be presumed that the lender authorized his agent to do
an illegal act"—citing many cases.

See, also, note to 29 L. R. A. (N. S.), 558:

"An independent fraud committed by an agent on his own
account is beyond the scope of his employment, and bears
analogy to a tort committed willfully by a servant for his
own purposes, and not as a means of performing the busi-
ness intrusted to him by his master." *Gunster v. Scranton
Co.*, 181 Pa., 327; 37 A., 550; 59 Am. St. Rep., 650. *Allen
v. R. Co.*, 150 Mass., 200; 22 N. E., 917; 5 L. R. A., 716;
15 Am. St. Rep., 185.

In the case of *Thomson-Houston Co. v. Capitol Co.*, 65
F., 341; 12 C. C. A., 643, it was said by Judge Taft (now
Chief Justice) :

"The truth is that where an agent, though ostensibly act-
ing in the business of the principal, is really committing a
fraud, for his own benefit, he is acting outside of the scope
of his agency, and it would, therefore, be most unjust to
charge the principal with knowledge of it."

In the *Knobelock Case* it is said:

"Knowledge of an agent while engaged in a fraud for his
own benefit, in which the principal is not in any way a par-
ticipant, cannot be imputed to the principal. Participation by
the principal in the fruits of the agent's fraud is not the test
whether the agent's knowledge is imputable to the principal,
but it affords evidence on the question whether the agent in
the fraudulent transaction was acting within the scope of
his agency, previously authorized or subsequently ratified,
which is the test."

As to the second ground, that the exaction of usury is a tort against the borrower, and before the Bank can be held responsible for it, it must appear to have been committed within the actual (not apparent) scope of the agency.

In *Goble v. Express Co.,* 124 S. C., 19; 115 S. E., 900, the Court declared:

"Hence a principal cannot be held liable in damages for the tort of his agent unless the agent was at the time acting within the actual scope of his agency."

As to the third ground, that the exaction of usury is a tort against the borrower and the rule of imputed knowledge or notice has no application to torts:

The defense of usury set up by the defendant in the case at bar, if not assimilated to an action in tort, certainly is based upon a statutory penalty; it certainly has no element of an action upon a contract. As to actions in tort and actions based upon a statutory penalty, the same rule should apply. It is interesting to find in the case of *Bank v. Burns,* 88 Ohio St., 434; 103 N. E., 93; 49 L. R. A. (N. S.), 764, the following:

"Manifestly, in a case sounding in tort there would be no presumption in law that the wrongful act of the agent was the act of the principal unless actual authority to do the act was proven or a subsequent ratification after all the facts and circumstances of the act were known. No man is presumed to do wrong. There is, in fact, in law, and in good morals a reason for the distinction that there may not be that legal identity between principal and agent in a case of tort that there is in a case of contract."

As to the fourth ground, that the rule of imputed notice will not be extended in favor of one who is shown to have been in collusion with the agent to work a wrong upon his principal:

"The rule charging the principal with his agent's knowledge is established for the protection of those who deal with the agent in good faith. If, therefore, the third person

acts in collusion with the agent to defraud the principal, the latter will not be chargeable with any information which the agent receives pertaining to the transaction, and this applies with greater force where the third person instructs the agent, or enters into an agreement with him not to communicate his knowledge to the principal." 2 C. J., 871.

In *Tatum v. Bank,* 193 Ala., 120; 69 So., 508; L. R. A. 1916-C, 767, it is held that if the person, who claims the imputation of the agent's knowledge, aided and abetted the agent in his fraudulent purpose against the principal, he is not entitled to rely upon such imputation,

Mr. Tiffany, in his work on Banks and Banking (page 336), states the principles clearly and comprehensively:

"The knowledge of the agent will not be imputed to the bank when the agent is engaged in committing an independent fraudulent act upon his own account, and the knowledge sought to be imputed is of facts which relate to that act, and which, if communicated, would prevent the consummation of the fraud, or when the agent is openly acting on his own behalf or on behalf of another in a transaction with the bank; but when in any transaction, the agent does an act as the sole representative of the bank, and is not acting openly on behalf of himself or another, although his conduct may be fraudulent, it is generally held that the bank may not avail itself of the act, in order to retain an advantage or to assert a claim founded thereon without being charged with his knowledge."

As to the fifth ground, that the rule of imputed notice will not be applied where the agent, though engaged within the scope of his agency, steps aside for the purpose of perpetrating an independent fraud upon his principal for his own benefit:

The theory upon which the doctrine of imputed notice, from the knowledge of the agent, is based, is that the agent, while acting within the course of his employment, will com-

municate to his principal all information affecting the principal's interest—a theory which in the common experience of mankind is without foundation, where the the agent acts against the interest of his principal, contrary to law, and in his own interest.

In a very late deliverance of the Court upon the point in the case of *Bacot v. S. C. L. & T. Co.*, 132 S. C., 340; 127 S. E., 562, it is said:

"But the rule imputing to the principal the agent's knowledge is not applicable where the knowledge of the agent was 'acquired while acting for himself or for a third person and not for the principal, * * * or where the knowledge is such that, according to human nature and experience, the agent is certain to conceal, or where the agent is acting in an adversary relation to the principal, * * * or some third person in his own interest which would be defeated by disclosure' "—citing cases.

"While under ordinary circumstances notice to an agent is notice to his principal, it is equally well established by all authorities that knowledge obtained by an agent who is engaged in perpetrating a fraud upon his principal will not be imputed to the principal." *Ex parte Mercer,* 129 S. C., 531; 125 S. E., 33.

To precisely the same effect are the cases of *Akers v. Rowan,* 33 S. C., 451; 12 S. E., 165; 10 L. R. A., 705. *Knobelock v. Bank,* 50 S. C., 259; 27 S. E., 962. *Wardlaw v. Oil Mill,* 74 S. C., 368; 54 S. E., 658; 114 Am. St. Rep., 1004. *Rapley v. Klugh,* 40 S. C., 134; 18 S. E., 680. *Bank v. Bank,* 13 Rich., 291. *Bank v. Chase,* 72 Me., 226; 39 Am. Rep., 319. *Bank v. Insurance Co.,* 23 N. D., 139; 134 N. W., 873; 38 L. R. A. (N. S.), 213. *Foreman v. Insurance Co.,* 104 Va., 694; 52 S. E., 337; 3 L. R. A. (N. S.), 444; 113 Am. St. Rep., 1071; Tiffany on Agency, 300; Mechem on Agency, § 721.

See, also, *Frenkel v. Hudson,* 82 Ala., 158; 2 So., 758; 60 Am. Rep., 736. *Bunton v. Palm* (Tex. Sup.), 9 S. W.,

182. *Central Coal & Coke Co. v. George S. Good & Co.,*
120 F., 793; 57 C. C. A., 161. *Waite v. City of Santa
Cruz* (C. C.), 89 F., 619. *Booker v. Booker,* 208 Ill., 529;
70 N. E., 709; 100 Am. St. Rep., 250. *Luton v. Sharp,* 94
Mich., 202; 53 N. W., 1054. *Traber v. Hicks,* 131 Mo.,
180; 32 S. W., 1145. *Sebald v. Citizens' Deposit Bank*
(Ky.), 105 S. W., 130; 14 L. R. A. (N. S.), 376. *Veney
v. Furth,* 171 Mo. App., 678; 154 S. W., 793.

"If, in the course of the same transaction in which he is
employed, the agent commits an independent fraud for his
own benefit, and designedly against his principal, and it is
essential to the very existence or possibility of such fraud
that he should conceal the real facts from his principal, then
the ordinary presumption of a communication from the
agent to his principal fails.  On the contrary, a presump-
tion arises that no communication was made, and conse-
quently the principal is not affected with constructive no-
tice." 2 Pom. Eq. Jur. (3 Ed.), § 675.

"While the knowledge of an agent is ordinarily to be
imputed to the principal, it would appear now to be well
established that there is an exception to the construction
or imputation of notice from the agent to the principal in
case of such conduct by the agent as raises a clear presump-
tion that he would not communicate the fact in controversy,
as where the communication of such a fact would necessarily
prevent the consummation of a fraudulent scheme which the
agent was engaged in perpetrating." *Innerarity v. Bank,* 139
Mass., 332; 1 N. E., 282; 52 Am. Rep., 710.

In the case of *Baker v. Berry Hill Co.,* 112 Va., 280;
71 S. E., 626; L. R. A. 1917-F, 303, it is said:

"There are cases which seemingly sanction the view that
the exception to the general rule does not apply to directors,
presidents, and other such managing officers of a corpora-
tion, through whom alone the corporation can act; but in
the well-considered case of *Barnes v. Trenton Gaslight Co.,*
27 N. J. Eq., 33, the opinion says: The rule based on the

17—S. C.—135.

presumption that the agent has communicated the facts to his principal does not apply where the agent's (though an officer of the corporation) interest is opposed to that of his principal, for in such a transaction the officer stands as a stranger to the company. His interest being opposed to the interest of the company, the presumption is not that he will communicate his knowledge to the company, but that he will conceal it; that where an officer of a corporation is dealing in his own interest, opposed to theirs, he must be held not to represent them in the transaction, so as to charge them with the knowledge he may possess, but which he has not communicated to them, and which they do not otherwise possess"—citing a number of decisions by both English and American Courts.

"Another instructive case in point is that of *Brookhouse v. Union Publishing Co.,* 73 N. H., 368; 62 A., 219; 2 L. R. A. (N. S.), 993; 111 Am. St. Rep., 623; 6 Ann. Cas., 675, * * * to which there is an extended note * * * reviewing a great number of decided cases; the conclusion being that the exception to the broad proposition that notice to the agent is notice to the principal, viz., where the knowledge is acquired by an officer of a corporation, while not acting for the corporation, but while acting for himself, is not imputable to the corporation, finds support in the decisions of the highest Courts of England, the United States Courts, and the Courts of twenty-seven States of the Union, citing the cases. * * * It is believed that no case can be found deciding that when the agent was acting for himself in a transaction, and in that same transaction defrauded his principal, and the principal received no advantage from the transaction, notice to the agent was notice to the principal."

In *Martin v. Land Co.,* 94 Va., 28; 26 S. E., 591, it is said:

"A corporation is not affected by the knowledge of an agent, when he himself contracts with it, or otherwise deals with it in a transaction in which his interests are opposed to

the interests of the company, for in such a transaction he could not represent the company."

"Notice is not to be imputed to the corporation merely because one or more of its officers have knowledge of the facts, especially where the circumstances are such as to raise a clear presumption that the officer did not communicate his knowledge to the corporation, as where the fact is one which he is interested in concealing from the corporation." *Arnett v. Stephens,* 199 Ky., 730; 251 S. W., 947.

In *American Surety Company v. Pauly,* 170 U. S., 133; 18 S. Ct., 552; 42 L. Ed., 977, it is said:

"The presumption that the agent informed his principal of that which his duty and the interests of his principal required him to communicate does not arise where the agent acts or makes declarations not in execution of any duty that he owes the principal, nor within any authority possessed by him, but to subserve simply his own personal ends or to commit some fraud against the principal. In such cases the principal is not bound by the acts or declarations of the agent unless it be proved that he had at the time actual notice of them, or having received notice of them, failed to disavow what was assumed to be said and done in his behalf."

"An exception to the general rule that notice to the agent is notice to the principal 'arises in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the agent acts for himself in his own interest and adversely to that of the principal." *Gunster v. Scranton Co.,* 181 Pa., 327; 37 A., 550; 59 Am. St. Rep., 650, quoting 1 A. & E. Enc. L., 1145.

"Notice to the president of a corporation is not notice to the corporation, where the president is acting in his own interests and against those of the corporation." Note 70 Am. St. Rep., 312, citing *Seaverns v. Hospital,* 173 Ill., 414; 50 N. E., 1079; 64 Am. St. Rep., 125. *Franklin Co. v. O'Brien,* 22 Colo., 129; 43 P., 1016; 55 Am. St. Rep., 118

*Bank v. Sneed,* 97 Tenn., 120; 36 S. W., 716; 34 L. R. A.,
274; 56 Am. St. Rep., 788. *Levy v. Kauffman,* 114 F.,
170; 52 C. C. A., 126. *Sproul v. Standard Co.,* 201 Pa.,
103; 50 A., 1003. *Hart v. Coryell,* 8 Kan. App., 496; 55
P., 514. *Bank v. Skinner,* 10 Kan. App., 517; 62 P., 705.
*Bank v. Lovitt,* 114 Mo., 520; 21 S. W., 825; 35 Am. St.
Rep., 770.

The conduct of the president is considered by the majority
of the Court *en banc* so infamously outrageous and fraudu-
lent that they are willing to go to the extent of punishing the
Bank, an entirely innocent party to the transaction, in favor
of an active participant in the fraud.

There is not in the minds of a minority of the Court the
slightest dilution of this outraged sentiment, but they are
not disposed to let the axe fall upon the necks of the innocent
stockholders and depositors. There is absolute unanimity
of condemnation of the conduct of the president as a breach
of his trust, a scandalous fraud upon the Bank and those
interested as stockholders, depositors, and creditors—a fraud
for his individual selfish benefit, purposely concealed from
his principal.

It is an obvious fallacy to say that the president was the
Bank, and notice to him, derived from his knowledge of the
fraud which he was perpetrating, was notice to the Bank.
The Bank was a corporation; the president was a natural
person. It is impossible in the nature of things that they
should have been the same. Besides, the appellant's excep-
tion recognizes that the president was the agent of the Bank;
how the agent and the principal could be the same person
has not been explained. Exception Two is in part as fol-
lows:

"And as Brown, the president and director of the Bank,
was the agent of the Bank in making this loan, his knowl-
edge with respect to the commissions is imputable to the
plaintiff Bank."

Besides, it seems clear that if the knowledge of the agent

that he himself had made an illegal exaction by way of commissions collected from the borrower, and put into his own pocket, is imputable to the principal because of the relationship of principal and agent between them, it is but a vain hope which is held out to the lender, that he may be relieved from the charge of usury if it should appear that he was not cognizant of the alleged exaction. In fact, it is held that the burden of proof is upon the borrower, to show knowledge on the part of the lender of the illegal exaction; a burden of exceeding light weight if the knowledge on the part of the unfaithful agent, that he himself had collected the illegal exaction, can be imputed to the principal as notice of that fact.

In *McLean v. Camak,* 97 Ga., 804; 25 S. E., 493, it is held that—

"The agent's own knowledge of the fact that he did charge the commission, uncommunicated to his principal, is not imputable to the latter."

To the same effect is *Harvard v. Davis,* 145 Ga., 580; 89 S. E., 740.

In the *Brown Case,* it was distinctly held that the lender must be shown to have had knowledge of the illegal exaction, not by the imputation to him of the knowledge of the perpetration, but by circumstances independent of that knowledge, and it was held that the lender did have knowledge from such circumstances and that the contract was usurious. Why go into that issue of fact, the burden of establishing which was on the borrower, if the knowledge of the agent settled the question by imputation? In the *Baxley Case,* the Court concluded that there was no evidence of such knowledge, and repelled the charge of usury. How could this conclusion have been reached if the imputation theory should prevail?

At the conference held by the Court *en banc* after the argument in the case, it was suggested by their Honors, Circuit Judges Townsend and Featherstone, that the facts

of this case did not bring it within the exception to the general rule. The general rule being that a principal is bound by the knowledge acquired by the agent while acting in a particular transaction within the scope of his agency, it was conceded that where the agent acted for his own benefit in fraud of the rights of the principal and contrary to law, the general rule did not apply; but it was insisted that there was a qualification to the exception, to the effect that where the agent was the sole representative of the corporation principal in the transaction under review, his knowledge was of necessity imputable to the principal.

  . I respectfully submit that the suggestion, as applied to the present case, betrays a misconception of the qualifications and of the reason of its invocation. To say that the principal is bound by the knowledge of the agent upon the ground that the agent happens to be the sole representative of the corporation in the transaction is to practically annihilate the rule that the principal is not so bound where the agent is acting fraudulently and in his own interest, for I am safe in saying that in 999 cases out of 1,000 the agent is the sole representative of the principal; they do not usually act in pairs. What the qualification means is that where the agent in a certain transaction is the only one who could have acted for the principal, his knowledge will be imputed to the principal, for there is no one to whom his knowledge could have been extended.

  The meaning of the doctrine becames clearer when the words are slightly tranposed. Instead of saying "that where the officer is the sole representative of the corporation in the transaction," the expression should be "that where in the transaction, the officer is the sole representative of the corporation." That is to say, not only in that, but in all other transactions he is the only representative of the corporation who could have acted.

  . The case of *McCaskill v. U. S.,* 216 U. S., 504; 30 S. Ct., 386; 54 L. Ed., 590, cited by his Honor, Judge Feath-

erstone, is clearly distinguishable from the case at bar. In fact, it sustains the position which I maintain, as will be seen. In that case the Government brought an action to cancel a land patent which had been issued to one Ward and by him conveyed to J. J. McCaskill Company, a corporation of which J. J. McCaskill was president and his son, Robert, secretary; they owning a large majority of the stock of the corporation with the entire management and control of its business and affairs. The patent which had been issued to Ward and the deed to the McCaskill Company were attacked upon the ground of fraud on the part of Ward by misrepresention in obtaining the patent. Both the trial Court and the Circuit Court of Appeals found as a matter of fact that J. J. McCaskill, the president of the McCaskill Company, had knowledge of the fraudulent representations made by Ward in obtaining the patent. The company contended that it was a *bona fide* purchaser and that the knowledge of McCaskill, though president of the company, could not be imputed to it by reason of the exception to the rule above stated. The Court held, as quoted by his Honor, Judge Featherstone:

"Undoubtedly a corporation is, in law, a person or entity entirely distinct from its stockholders and officers. It may have interests distinct from theirs. Their interests, it may be conceived, may be adverse to its interest, and hence has arisen against the presumption that their knowledge is its knowledge, the counter presumption that in transactions with it when their interest is adverse their knowledge will not be attributed to it. But while this presumption should be enforced to protect the corporation it should be carried so far as to enable the corporation to become a means of fraud or a means to evade its responsibilities. A growing tendency is, therefore, exhibited in the Courts to look beyond the corporate form to the purpose of it and to the officers who are identified with that purpose."

The Court adds:

"The case at bar is within the principle. The bill alleges that J. J. McCaskill and Robert E. L. McCaskill were co-partners and engaged in the manufacture of lumber at Free-port, Fla. They incorporated this business, it is alleged, under the laws of Florida, 'by the corporate name of J. J. McCaskill Company, with the said J. J. McCaskill as pres-ident and the said Robert E. L. McCaskill as secretary, owning a large majority of the stock of said corporation, with the entire management and control of the business and affairs of said corporation.' There is no denial of this al-legation. The interest of the corporators and the corpora-tion thus shown to be identical, not adverse, we think the ruling in *Simmons Creek Coal Co. v. Doran* is applicable."

The ruling referred to was (142 U. S., 417; 12 S. Ct., 239; 35 L. Ed., 1063):

"Associated together to carry forward a common enter-prise, the knowledge or actual notice of all these corporators and the president was the knowledge or notice of the com-pany, and if constructive notice bound them it bound the company."

There is but a single parallel circumstance in that case and the case at bar, and that is a transaction in which the president had certain information. In the former the president was practically the corporation, as he and his brother owned a large majority of the stock and were in ex-clusive management of the affairs of the corporation; in the case at bar the president was simply an officer in the Bank, the stock of which was owned by stockholders generally, and the affairs of which were under the control of a board of directors elected by the stockholders to whom the pres-ident reported this identical transaction and all other loans. In the former the interest of McCaskill was identical with that of the corporation which acquired the full benefit of the deed from the fraudulent patentee. In the case at bar, the corporation got nothing; it was not intended that it

should get anything; the details of the transaction were purposely concealed from the corporation by the president; his interest was directly and purposely adverse to that of the corporation. If the test is the adverse or identical interest of the officer and the corporation, I do not see how it is possible to obtain any comfort from the *McCaskill Case.* The McCaskill Company obtained title to the land covered by the fraudulent patent, held on to it, enjoyed the fruits of it, and was the defendant in the case brought by the United States, vigorously endeavoring to sustain their title —a very different situation from that in the case at bar, and how different from the circumstances referred to above in the extract from the *Simmons Case.*

In the case of *Brookhouse v. Union Publishing Co.,* 73 N. H., 368; 62 A., 219; 111 Am. St. Rep., 623; 6 Ann. Cas., 675; 2 L. R. A. (N. S.), 993, the note to which is cited by his Honor, Judge Featherstone, it is declared, quoting syllabus:

"That one attempting to use a corporation's bank account to misappropriate funds of his ward is its treasurer and managing officer does not alter the rule that the corporation is not chargeable with knowledge of its agent when he is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act."

In *Brookhouse v. Union Publishing Co.,* 73 N. H., 368; 62 A., 219; 2 L. R. A. (N. S.), 993; 111 Am. St. Rep., 623; 6 Ann. Cas., 675, the Court said:

"The knowledge of a corporation, whether actual or imputed, must necessarily be that of its officers; but this circumstance does not transform the officers into principals. * * * If, as the plaintiff argues, the assistant treasurer represented the defendant in the receipt of the deposits, Moore was not the only officer of the corporation through whom the corporation could act relating to the matter."

The case of *Lea v. Mercantile Co.,* 147 Ala., 421; 42 So.,

415; 8 L. R. A. (N. S.), 279; 119 Am. St. Rep., 93, cited and quoted from by his Honor, Judge Featherstone, as "a strong case in point," presents to my mind an entirely different situation from that in the case at bar. · In that case an action was brought by a corporation, a judgment creditor of another corporation, insolvent, to compel a subscriber to the capital stock of the insolvent corporation who had paid for his stock with real estate at an overvaluation, to account for the difference. The defendant subscriber alleged that the creditor corporation had full knowledge of the conditions under which he subscribed and that for that reason he had committed no fraud upon it and was not responsible for the alleged overvaluation. A man by the name of Riddle was the president of the creditor corporation and was also interested in the development undertaken by the insolvent corporation and had full notice of the matters connected with its organization. He knew that the land of the various subscribers had been put in at an overvaluation, upon the basis of its then value, with the hope of advanced prices upon sales during the Birmingham boom. The question was whether the knowledge of Riddle of these facts should be imputed to the corporation, in relief of the subscriber who had been sued. The Court held that it should and placed their holding specifically upon the ground that the corporation (creditor), represented by Riddle as president and manager, had been organized by Riddle, who owned all of the stock except a small block owned by a nonresident; that he was its president and general manager "and that he constituted the company in all its outside relations with the world"; that "he was the sole manager and controller of the creditor company at his will—its *alter ego*—and, it seems, was its sole stockholder but one, the other being a nonresident. Indeed, it is difficult to consider his as other than the creditor corporation itself, so completely were the affairs of it subject to his will and under his immediate control." "He was, as we have said, to all intents and purposes the

corporation itself.    It could be nothing but the sheerest non-sense to say that as agent he should communicate the knowledge to himself as the managing representative of his corporation.    Since the corporation could acquire notice in no other way than by and through it managing head or officer, it will scarcely be doubted that notice to such officer is of necessity notice to it."

It hardly seems necessary to point out the glaring differences between this case and the case at bar.    Riddle owned practically the entire stock in the corporation; he was the president and general manager, in absolute control of the affairs of the corporation; no board of directors to be consulted; he was the corporation and its interests were the same as his; in the loan transaction there was no one to consult and no one to whom notice acquired by him could be extended; there was no suggestion that in the loan transaction he was acting outside of the scope of his agency, or that he was perpetrating a fraud upon his corporation for his own benefit and against the law.    In the case at bar the president, Brown, is not shown to have owned any more stock than was necessary to qualify him as a director; it appears that while he as all other bank presidents do, negotiated loans, he reported all of them to the board of directors and they were subject to their approval; the Bank received no benefit from the illegal commissions; all were to Brown who studiously concealed the exaction from the board of directors in presenting for their approval this very loan.    The opinion so strongly relied upon closes with this striking summary:

"The notice or knowledge of the agent will never be imputed to his principal (1) 'when it is such as it is the agent's duty not to disclose; (2) when the agent's relations to the subject-matter or his previous conduct renders it certain that he will not disclose it; and (3) when the person claiming the benefit of the notice, or those whom he represents,

colluded with the agent to cheat or defraud the principal' "
—citing Mechem on Agency, § 670.

Both the second and third conditions, absent in the *Lea
Case,* are present in the case at bar.

His Honor, Judge Featherstone, observes:

"In the case at bar, Brown, who made the trade with Miss
Heyward, was the Bank. What he knew the Bank knew. If
he had wanted to impart the information to the Bank to
whom would he have imparted it?"

It is begging the question to say that Brown was the Bank.
What made him the Bank, I do not know. · In the case cited
by the learned Judge, *McCaskill v. United States,* 216 U. S.,
504; 30 S. Ct., 386; 54 L. Ed., 590, and quoted by him, it
is said:

"Undoubtedly a corporation is, in law, a person or entity
entirely distinct from its stockholders and officers."

Invariably the cases which hold the identity of the officer
and the corporation so complete as to charge the corporation
with the knowledge or act of the officer, amounting to a
fraud, are cases where the officer practically owns the corpo-
ration and is in absolute and exclusive control of its affairs
—a situation by no means presented in the case at bar. The
question as to whom Brown could have made a report is
readily answered: To the board of directors, to whom it
not only was his duty but his custom to report all loans for
their approval, and from whom he had good reason to and
did conceal that part of the loan transaction which inured to
his benefit and which, according to his own statement,
would have balked the approval of the directors.

Another "strong case in point," cited by his Honor,
Judge Featherstone, is *Atlantic Cotton Mills v. Indian Or-
chard Mills,* 147 Mass., 206; 17 N. E., 49; Am. St. Rep.,
698. It is, in my opinion, far afield from the point in con-
troversy. In that case one Gray was the treasurer of each
of the corporations; he had misappropriated more than
$200,000 of the Atlantic Mills funds; periodically in order

to cover up his defalcation he would draw checks of the Indian Orchord Mills, in favor of the Atlantic Mills, and pass them to the credit of the Atlantic Mills.   In an action by the Atlantic Mills against the other mill, for an accounting of all matters open between them, the Indian Orchard Mills claimed a set-off to the extent of the amount so abstracted by Gary and passed to the credit of the Atlantic Mills.   The latter denied the right of set-off, holding on to the amount so fraudulently passed to their credit.   The case was decided in favor of the Indian Orchard Mills upon the unquestionably sound principle that one cannot retain the benefit of an agent's   fraudulent   transaction   without   accepting   the consequences of the agent's knowledge.   The Court says:

"We have preferred to put the decision of this point upon the broad ground that if the treasurer of a corporation is a defaulter, and his defalcation is as yet unknown and unsuspected, and he steals money from a third person, and places it with the funds of the corporation in order to conceal and make good his defalcation, and the corporation uses the money as its own, no other officer knowing any of the facts, the corporation does not thereby acquire a good title to the money as against the true owner, but the latter may maintain an action against the corporation to recover back the same. * * *   It must be deemed to have known what he knew, and it cannot retain the benefit of his act without accepting the consequences of his knowledge * * * and under the circumstances, if the plaintiff would adopt the intention to make it a payment, it must also adopt the fraud. It cannot adopt so much of Gary's act as was beneficial, and reject the rest."

Comment and comparison are unnecessary to demonstrate the inappositeness of the citation.   It is suggested that because the Bank is seeking to recover upon the contract made by Brown, it cannot do so without taking along with it his knowledge of the illegal exaction.   The Bank has received no part of the illegal exaction; it is not attempting to recover

any part of it; it is only attempting to recover upon the contract as made, which was authorized by Brown's employment; all beyond that was outside of the scope of his agency.

The case of *Curtis v. United States,* 262 U. S., 215; 43 S. Ct., 570; 67 L. Ed., 956, is also cited by the learned Circuit Judge. It is clearly distinguishable from the case at bar. There the stockholders of a corporation intrusted another stockholder who was also vice president and active manager of the company, with the business of procuring titles to lands to be patented under the Federal law, for which he was to be paid a stated sum per acre, and where lands were so procured by means of a fraud upon the Goverment, of which the stockholder thus acting as agent of the corporation, had knowledge of the fraud of the entrymen, it was held that his knowledge was imputable as notice to the corporation. The decision was based squarely upon the fact that the other stockholders, along with the agent stockholder, were seeking to retain the benefit of the agent's transaction. The Court held upon the contention that the agent had an adverse interest sufficient to bring the transaction within the exception to the general rule:

"Curtis and Collins [the other stockholders] knew exactly how far Holbrook's [the agent's] interest was adverse to. theirs, but trusted him in the joint enterprise notwithstanding. The adverse interests as between them in sharing the fruits of the common business cannot enable the company to retain its share and repudiate the agent with all he knew."

The case would be parallel if the Bank knew of Brown's illegal exaction and notwithstanding held on to the notes and mortgages representing the various loans.

The learned Circuit Judge also cites the case of *Bank v. Burns,* 88 Ohio St., 434; 103 N. E., 93; 49 L. R. A. (N. S.), 764. That portion of the syllabus (by the Court) quoted by him is sufficient to demonstrate the inappositeness of the citation to sustain the position taken:

"Where the officer is acting both for himself as an individual and as manager of a banking corporation in the purchase of a note from himself by the bank, and his action in that behalf is adopted and ratified by the bank, the manager's knowledge as a man is equally his knowledge as manager of the bank."

It is the height of irony to suggest, as the learned Circuit Judge does, that the conduct of Brown in securing for himself an illegal exaction was neither fraudulent nor an injury to the Bank, for the reason that Miss Heyward, the mortgagor, might not claim usury, in view of the fact that she has claimed it, and its allowance results in a loss to the innocent creditors, depositors, and stockholders, of more than $12,000.

The case of *Morris v. Bank,* 109 Ga., 12; 34 S. E., 378; 46 L. R. A., 506, is quite similar to the case of *Bank v. Burns, supra,* and the decision is based upon the same principle that the bank, having ratified the act of the officer, claimed the benefit of the transaction must be held chargeable with the knowledge of the officer that the paper discounted was affected with fraud.

In *Anderson v. Kinley,* 90 Iowa, 554; 58 N. W., 909, it was held that where the secretary and manager of a company owned or controlled a large part of the capital stock and managed much as he wished his knowledge was imputable to the corporation.

In the case of *Thomson-Houston Co. v. Capitol Co.,* 65 F., 343; 12 C. C. A., 643, the agent, although apparently a sole actor, had deserted his position as agent, and notice of his fraud was not imputed to the principal.

The same may be said of the case of *Bank v. Thompson,* 118 F., 798; 56 C. C. A., 554, which was also a case where the cashier of the bank was the sole actor in a fraudulent transaction, but the "sole actor" doctrine was disapproved, and, because of the adverse fraudulent interest of the agent, notice was not imputed to the bank.

The principles are more clearly stated in the case of *Kean v. Bank* (C. C. A.), 294 F., 214, than I have found anywhere:

"Under this view of the law, the question in the so-called 'sole actor' cases, as well as in all others, would be whether the agent was acting within the scope of his authority in the particular transaction, or whether he had departed from such representative capacity and was either dealing directly with his principal or was inactive on behalf of his principal and in an adversary position. If the agent was active on behalf of the principal in accomplishing the result complained of, and if, in so doing, he was acting within the scope of his authority, this would be made the predicate of liability, whether he was fraudulent or not, or whether or not he had personal ends to subserve. If he had stepped aside from his capacity as agent, and was dealing adversely with his principal, it would make no difference whether he was the sole actor or not."

As is clearly shown in the case of *Knobelock v. Bank,* 50 S. C., 259; 27 S. E., 962, many Courts proceed upon the theory of the legal identity of the principal and agent, in determining the question whether the act or knowledge of the agent should be imputed to the principal. It appears to me that his Honor, Judge Featherstone, has done likewise. The Court, however, in the *Knobelock Case,* does not concur in that view. It is there said:

"The rule imputing to the principal the agent's knowledge is by some Courts based upon the reason that the agent is substituted for the principal, has legal identity with the principal, and under the operation of this reason, the principal is more inflexibly held bound by the agent's knowledge. Other Courts, by far the majority, including our own, base the rule on the ground that it is the duty of the agent to communicate to his principal all knowledge which he possesses material to the principal's business, and the presumption that he has done that duty."

The president testified that the loans in every instance were submitted to the board of directors of the Bank, and nothing was said to them about the two per cent. commissions; and he says, further, that if the commissions had been included in a check for both interest and commissions the board would have had nothing to do with the transaction.

The president of the Bank, of course, knew that he had made an illegal exaction; and, assuming that that exaction infected the note with usury if the Bank knew of and consented to it, the question is whether the Bank thereafter held the note which was legal upon its face, charged with the knowledge of the president that he for his own purposes had imposed an illegal exaction.

Without exception the cases holding the principal with the knowledge of the agent are cases where third persons not parties to the fraudulent transaction have been innocently injured by the fraud of an agent.

III. Assuming that under the law as it stood prior to the passage of the Act of 1916 (Code of 1922, Vol. 3, § 3640) the transaction in question may have been judicially declared usurious, at the time of the trial the penalty therefor, under Section 3639, had been repealed by Section 3640, and was not recoverable.

For the reasons stated, there is not the slightest ground for charging the Bank with usury, under the law as it stood prior to the passage of the Act of 1916; for there is not a particle of evidence tending to show either that the Bank contracted to receive the illegal commissions or that it had knowledge of the exaction, by its agent, or that it in the slightest degree participated in or benefited by it. But even if it had appeared beyond controversy that the agent had exacted an unreasonable commission, and that the Bank knew of such exaction, the Bank could not be held amenable to the penalties of Section 3639, for the reason that the Act of 1916 (Section 3640) specifically relieves the lender from the charge of usury under the circumstances stated, and upon

18—S. C.—135.

the principle that the repeal of a statute providing a penalty or forfeiture, applies to prior as well as to subsequent transactions.

The Act of 1916 (Section 3640) is as follows:

"No lender shall be charged with usury under the preceding sections by reason of money paid or agreed to be paid others by the borrower in order to obtain a loan where the lender neither took nor contracted to take more than lawful interest: *Provided, however,* That suit may be brought within six months from the date of such transaction against such other persons as may have charged excessive fees or excessive commissions, and recovery may be had thereon for the excess over and above a reasonable fee or reasonable commissions."

The case of *Brown v. Brown,* 38 S. C., 173; 17 S. E., 452, had decided that where the agent had, with the knowledge of the lender, exacted from the borrower an unreasonable sum for his services in negotiating a loan, the original contract was thereby tainted with usury, and that the penalties provided for in what is now Section 3639, attached, whereby the lender was made subject to a forfeiture of all interest and costs and also to a forfeiture of "double the total amount received in respect of interest." This has been followed in all cases before the Court, between the time of the decision of the *Brown Case,* 1892, and the date of the Act of 1916. It was necessarily a construction of Section 3639, and declared the rights and liabilities of the parties under that section; it was as effectual as if the statute had specifically so provided.

The Act of 1916, Section 3640, completely abrogated the rule declared in the *Brown Case,* and provided an entirely different remedy for the borrower. It declares that the exaction of even an unreasonable sum for the service indicated should not constitute usury, but that the borrower's remedy should be a suit against the intermediary for the excess over and above a reasonable compensation.

At the time of the trial of the case, April, 1924, the Act of 1916 was in force, and the rule in the *Brown Case* was not. The question for determination, therefore, is: Has the borrower the right to recover a penalty by way of forfeiture, authorized at the time the interdicted act was committed, but abrogated at the trial of his suit therefor. (Note.—A part of the alleged penalty was incurred after the passage of the Act of 1916, which clearly should not have been allowed, but not even that part which was incurred between 1912 and 1916, prior to the Act, should have been allowed. The matter will be treated as if all had been incurred prior to the Act.)

The leading authority upon the subject is the case of *Ewell v. Daggs,* 108 U. S., 143; 2 S. Ct., 408; 27 L. Ed., 682. In that case the note and mortgage were executed in 1856; the stipulated interest was twenty per cent.; at that time there was a statute of Texas limiting the rate of interest to twelve per cent., and providing a penalty for exceeding it, of a forfeiture of all interest; in 1870 the Constitution of Texas, which then went into effect and continued in force till after the trial, repealed all usury laws, and interdicted any defense upon that ground; in 1872 the payee of the note brought suit against the maker, and recovered a judgment for the full amount of the note, less certain credits, the interest being calculated at twenty per cent.; the land which had been mortgaged by the maker of the note really belonged to his brother; in 1875 the mortgagee brought an action to foreclose the mortgage against the maker of the note and the brother; the brother claimed the benefit of the Texas usury statute, which was in force at the time the note and mortgage were executed; the lower Court held that the Constitution of Texas repealed all usury laws, and prevented the defense of usury set up after that repeal.

It thus appears that the precise question involved in the

case at bar was then decided upon appeal. The Supreme Court said:

"It is claimed by the appellant that, notwithstanding this repeal of the usury laws, the rights of the parties are to be determined according to the law in force at the time the transaction took place; that by the terms of that law the contract between Daggs and James B. Ewell was void as to the entire interest reserved and paid; that no subsequent law could make valid a contract originally void; and that the appellant [the brother of the debtor], is not bound by the judgment rendered against James B. Ewell in favor of Daggs, and is entitled in the present suit to make the defense."

The Court concluded as follows:

"The effect of the usury statute of Texas was to enable the party sued to resist a recovery against him of the interest which he had contracted to pay, and it was, in its nature, a penal statute inflicting upon the lender a loss and forfeiture to that extent. Such has been the general, if not uniform, construction placed upon such statutes. And it has been quite as generally decided that the repeal of such laws, without a saving clause, operated retrospectively, so as to cut off the defense for the future, even in actions upon contracts previously made. And such laws, operating with that effect, have been upheld, as against all objections on the ground that they deprived parties of vested rights, or impaired the obligation of contracts. The very point was so decided in the following cases"—citing them; they are later considered herein.

The Court continues:

"And these decisions rest upon solid ground. Independent of the nature of the forfeiture as a penalty, which is taken away by a repeal of the Act, the more general and deeper principle on which they are to be supported is, that the right of a defendant to avoid his contract is given to him by statute, for purposes of its own, and not because it affects the

merits of his obligation; and that whatever the statute gives, under such circumstances, as long as it remains in *fieri,* and not realized by having passed into a completed transaction, may, by a subsequent statute, be taken away. It is a privilege that belongs to the remedy, and forms no element in the rights that inhere in the contract. The benefit which he has received as the consideration of the contract, which, contrary to law, he actually made, is just ground for imposing upon him, by subsequent legislation, the liability which he intended to incur. That principle has been repeatedly announced and acted upon by this Court"—citing cases.

In *Curtis v. Leavitt,* 15 N. Y., 9, cited by the Supreme Court of the United States in *Ewell v. Daggs,* it is held:

"The Act being in the nature of a repeal of penalties and forfeitures, and containing no reservation, express or implied, operates as well on existing as subsequent suits; extinguishing not only the right of pleading such defense thereafter, but of urging or maintaining the plea, although previously put in, if not already allowed and established."

In *Welch v. Wadsworth,* 30 Conn., 149; 79 Am. Dec., 239, also cited in *Ewell v. Daggs,* it is held:

"The parties to usurious contracts hold any right they may have to the penalties given by the law, subject to a modification or repeal by the Legislature, and a consequent direct or indirect validation of the contract."

In *Andrews v. Russell,* 7 Blackf. (Ind.), 474, also cited in *Ewell v. Daggs,* it is held:

"The Act of 1843 respecting interest, which declares that usurious contracts shall not be void, * * * embraces contracts made before as well as those made after its passage."

In *Wood v. Kennedy,* 19 Ind., 68, also cited in *Ewell v. Daggs,* it is held:

"The forfeiture of interest, on account of usury, is a penalty; hence the repeal of the statute creating the forfeiture will relieve from it to the extent of the repeal."

In *Danville v. Pace,* 25 Grat. (Va.), 1; 18 Am. Rep., 663, also cited in *Ewell v. Daggs,* it is held:

"The Act of March 22, 1873, * * * in reference to the defense of usury by corporations prohibiting the defense is retroactive in its operation, applying to contracts made by a corporation before its passage, even though suit may have been brought on such contract before its passage."

In *Parmlee v. Lawrence,* 48 Ill., 331, also cited in *Ewell v. Daggs,* it is held:

"A right to a three-fold forfeiture of all the interest reserved on a contract, on account of usury, is not a vested right which the Legislature cannot take away."

In *Woodruff v. Scruggs,* 27 Ark., 26; 11 Am. Rep., 777, also cited in *Ewell v. Daggs,* it is held:

"The Act of July 13, 1868, repealing the usury laws of this State, operated upon all contracts made previously to its passage, still outstanding, as well as upon all future contracts."

In *Pensacola R. R. v. State,* 45 Fla., 89; 33 So., 986; 110 Am. St. Rep., 68, the Court says:

"The law seems to be quite clearly settled that in actions of a penal character, depending upon a statute, the repeal of the statute pending an appeal will deprive the Appellate Court of any power to render a judgment by which this penalty may be enforced, and that the effect of a repealing statute is to obliterate the statute repealed as completly as if it had never been enacted, except for the purpose of those actions or suits which were commenced, prosecuted and concluded whilst it was an existing law, and that an action cannot be considered as concluded while an appeal therein is pending before an Appellate Court having jurisdiction to review it."

"The effect of the repeal of a penal statute is to prevent any prosecution, trial, or judgment for any offense committed against it while it was in force unless there is a saving clause in the repealing Act.  If it is repealed pending an

appeal and before the final action of the Appellate Court, the appeal will prevent the affirmance of a conviction."

In *Satterlee v. Matthewson*, 2 Pet., 412; 7 L. Ed., 458. also cited in *Ewell v. Daggs,* the Court said:

"Should a statute declare, contrary to the general principles of law, that contracts founded upon an illegal or immoral consideration, whether in existence at the time of passing the statute, or which might thereafter be entered into, should nevertheless be valid and binding upon the parties, all would admit the retrospective character of such an enactment, and that the effect of it was to create a contract between parties where none had previously existed."

In 25 R. C. L., 943, it is said:

"Since there can be no vested right in a penalty until it has been reduced to judgment, the unqualified repeal of a statute imposing a penalty, operates the same way as the repeal of a strictly criminal statute, that is, it abrogates all rights of action which had not been reduced to judgment, and all pending actions and proceedings to recover a penalty which had not been prosecuted to final judgment, are defeated by the repeal, unless there is a saving clause in respect of penalties that have been incurred. * * * After the repeal of a usury law, no forfeiture or penalty can be visited on the party holding the usurious contract."

In Cooley on Constitutional Limitations, 373, it is said:

"On the same principle legislative acts validating invalid contracts have been sustained, when these Acts go no farther than to bind a party by a contract which he has attempted to enter into, but which was invalid by reason of some personal inability on his part to make it, or through neglect of some legal formality, or in consequence of some ingredient in the contract forbidden by law; the question which they suggest is one of policy and not a constitutional power."

In Sedgewick on Statutes and Constitutional Law, 129, it is said:

"There can be no doubt of the truth or validity of the as-

sertion, that when there is a repeal of a penal statute, no penalty can be enforced, nor punishment inflicted for a violation of the law while in force, unless under some special provisions."

In civil actions of a penal character, depending upon a statute, where the penalty inures to the State, the repeal of such statute pending an appeal will deprive the Appellate Court of any power to render a judgment by which the penalty may be enforced." *Pensacola & A. R. Co. v. State,* 45 Fla., 86; 33 So., 985; 110 Am. St. Rep., 67.

"The repeal of a penal statute, without any saving clause, takes away all right to proceed thereunder for the recovery of a penalty, even in an action pending when the repeal takes effect." *County v. Dressner,* 23 App. Div., 215; 48 N. Y. S., 953.

At common law "if a statute giving a special remedy is unconditionally repealed, without a saving clause, * * * all actions must stop where the repeal finds them." *Merlo v. Coal Co.,* 258 Ill., 328; 101 N. E., 525.

"The repeal of a statute creating a right of action, without a saving clause as to pending suits, destroys the right; and a pending action at whatever stage, even after judgment but before the entry thereof, or pending an appeal, falls." *Ettor v. Tacoma,* 228 U. S., 148; 33 S. Ct., 428; 57 L. Ed., 773.

In *Coe v. Muller,* 74 Fla., 404; 77 So., 90, it is held:

"Usury being merely a statutory defense, not founded upon any common-law right, either legal or equitable, it is clearly within the power of the Legislature to take it away."

In *State v. Cole,* 2 McCord, 1, it is held:

"No doctrine of law is better established than that where one commits an offense which is made a felony by statute, and then the statute be repealed, he cannot be punished as a felon in respect of that statute. And the doctrine applies as well to the imposing and recovery of penalties, as to the creating and punishment of felonies."

In the case of *State v. Taylor,* 2 McCord, 483, it was

conceded by the Attorney General that the contention of the defendant's counsel was correct that—

"When a statute is repealed, the Court has no longer jurisdiction of cases under it, unless there is some saving clause for the purpose of punishing the offense under the former existing law."

In *Allen v. Farrow,* 2 Bailey, 584, the plaintiff brought what was then denominated a *qui tam* action, for the recovery of one-half of treble the amount loaned upon an usurious contract, the other half going to the State, under the Act of A. D. 1777. The action was commenced and the cause was docketed and at issue, prior to December, 1830, at which time the penal provisions of the Act of 1777 were repealed. The trial Judge (Richardson) ordered a nonsuit, upon the ground that the action could not be maintained after the Act of 1777 had been repealed. The order of nonsuit was sustained, the Court saying:

"The plaintiff's counsel have relied on the ground, that as soon as the offense was committed, and proceedings were instituted for the recovery of the penalty, a right vested in the plaintiff, which the Legislature could not take away by the Act of 1830. I cannot admit the correctness of this proposition. The farthest that the argument can be legitimately extended, would be, that an inchoate, or imperfect interest commenced. The right itself had not vested, nor do I conceive that it could vest, until the money was received. Up to that time, it was under the control of the law, it is a power delegated by law, and, as I conceive, to sue for the use of the State, and for himself; and the same authority, which delegated that power, could revoke it at any time before its final execution."

In *State v. Bank,* 12 Rich., 609, the Court, by Judge O'Neall, says:

"The effect of a repeal on a penalty incurred, before the repealing Act, is to discharge the penalty."

In *Lay v. Lay,* 10 S. C., 208, the Court quotes with ap-

proval the foregoing extract from the case of *State v. Cole,* 2 McCord, 1, and cites with approval *Allen v. Farrow,* 2 Bailey, 584, *supra.*

In *Cope v. Hampton,* 42 S. C., 17; 19 S: E., 1018, the plaintiff sued the County for an injury upon a bridge; at the time of the injury, all that was required of the plaintiff by the statute was to prove his injury and that his load did not exceed the ordinary weight. After the injury and before the trial, the law was amended to require the plaintiff to allege and prove negligence on the part of the County. This he failed to do upon the trial, taking the position that the amending Act did not apply to him. A nonsuit was granted, which was sustained by this Court, saying:

"As it seems to us, the liability allowed by statute is somewhat in the nature of a penalty imposed for doing that which the statute prohibited, or for omitting to do that which the statute required, the amount recoverable, on the conditions named, to be fixed by the jury instead of the statute. It is well settled that an action for a penalty must be brought while the statute is in force because the repeal of the statute takes away the right of action. 'The statute under which the penalty is sought to be recovered must be of force at the rendition of the judgment; and if that be the true principle, it follows necessarily that if there be no law, the Court can render no judgment.' \* \* \* *Allen v. Farrow,* 2 Bailey, 586; *State v. Solomons,* 3 Hill, 96. The Plaintiff in such a case has no common-law remedy. The right derived is solely from the statute, and the remedy must be furnished by that statute."

In *State v. Mansel,* 52 S. C., 468; 30 S. E., 481, the defendant was convicted of a violation of Section 41 of the Dispensary Law, which was of force at the time the offense was commited but which had been repealed at the time the defendant was tried. The Court sustained a plea to the jurisdiction of the Court upon the ground:

"When a statute contains a section prescribing a punish-

ment for a violation of the section, and this section is repealed after a party has violated the section, but before sentence is imposed upon him, he cannot be punished for such violation."

Taken into consideration with the declaration of the Court in *State v. Cole,* 2 McCord, 1: "And the doctrine applies as well to the imposing and recovery of penalties, as to the creating and punishment of felonies"—there appears no answer to the proposition.

See, also, *State v. Moore,* 128 S. C., 192; 122 S. E., 672. *State v. Lewis* (S. C.), 33 S. E., 351.

It is conceded that the case of *Gilliland v. Phillips,* 1 S. C., 152 (Moses, Willard and Hoge, JJ.), is opposed to the conclusions reached. It is also opposed to the South Carolina cases cited hereinbefore, decided both before and after that decision; it is opposed to the principle announced in the recognized text-books, the decisions of the Supreme Court of the United States, and of practically every State Court. I think that it should be left in its isolation.

It has been suggested that it is against public policy for this Court to countenance the exaction by the president of a bank of a commission for his personal service in negotiating a loan by his bank, and that the affirmance of Judge Johnson's decree, widely spread as it will be, would work havoc with borowers and practically annihilate the usury laws of the State.

It seems to be assumed that the affirmance of the decree amounts to an approval of such conduct. This assumption is wide of the mark; the Court considers it a most flagrant and reprehensible breach of trust, deserving the severest judicial condemnation; what the affirmance means is that the Bank is not liable for the penalties of the usury statute.

I have been utterly unable to grasp the argument of his Honor, Judge Featherstone, in reply to the foregoing proposition. He says:

"In answer to this position, it is sufficient to say that

Section 3640 is not the section which fixes the penalty. That is done by Section 3639. It cannot be contended that the Act of 1916 repealed Section 3639. It does not undertake to do so. Therefore, the section which fixes the penalty and which covers all cases of usury, is still in existence."

It never occurred to me, nor is there a suggestion in my opinion, that Section 3640 repealed Section 3639. What was usury before the passage of the Act of 1916 (Section 3640) is still usury, except that under the express provisions of that Act:

"No lender shall be charged with usury under the preceding section (3639) by reason of money paid or agreed to be paid others by the borrower in order to obtain a loan, where the lender neither took nor contracted to take more than lawful interest."

I do not see how anything could possibly be plainer than the provisions of that Act, recognizing the continued efficacy of Section 3639 except in the transaction referred to. As the learned Judge says:

"This Act (1916) clearly defines what should not constitute usury, in a given state of facts. It did not undertake to repeal the usury statute, but, on the contrary, expressly refers to and recognizes Section 3639"—a proposition in which I thoroughly agree.

Why "under these circumstances all of the authorities quoted by Mr. Justice Cothran manifestly have no application" is inconceivable and is manifestly a *non sequitur*.

There are only two possible theories upon which to base a conclusion that the Act of 1916 (Section 3640) has no application to the present case: (1) That the payment by the borrower to Brown, the president, of a commission of two per cent., was not a payment to another; (2) that the Act of 1916 (Section 3640) cannot be given a retrospective effect.

The commissions were paid directly to Brown; he received them and put them in his pocket; the Bank never

received or contracted to receive a penny of them; the Bank had no knowledge of the exaction; Brown as an individual was one person; the Bank was a distinct person or entity (*McCaskill v. United States, supra*); it logically follows that the payments were made to a person other than the lender.

The learned Judge concludes that a defendant in a criminal case cannot be punished under a statute which was in force at the time of the commission of the offense, but which had been repealed at the time of the trial; but assumes two positions in maintenance of his conclusion that this principle is not applicable to the present case: First, that Section 3639 prescribing the penalty has never been repealed; and, second, that there is nothing in the Act of 1916 (Section 3640) which purports to give it a retrospective effect.

As to the first position, it has not been contended that Section 3639 was repealed by the Act of 1916, except in so far as it was applicable, prior to the Act of 1916, to the condition defined in the Act. Prior to the passage of the Act, by the decisions of this Court beginning with *Brown v. Bank, supra,* a lender who was cognizant of an illegal exaction of commissions by his agent, was chargeable with usury. The Act annihilated the effect of those decisions; it repealed Section 3639, so far as this condition was concerned, and prescribed new and substantive remedy for the borrower: An action for the recovery of such excessive charges, against the agent. All remedy and penalty against the lender is necessarily pretermitted by the Act.

As to the second position, that the Act is not retrospective in its effect, I can only call attention to the authorities cited above, holding with absolute unanimity that the right to the penalties of a usury statute is not a vested right, and may be taken away by legislative authority at any time, even after the penalty may have been incurred, before a recovery has been actually adjudicated. It is a matter of regret that to the mind of the learned Circuit Judge they "manifestly

have no application." Particular attention is called to the cases from our own reports: *State v. Cole*, 2 McCord, 1. *State v. Taylor*, 2 McCord, 483. *Allen v. Farrow*, 2 Bailey, 584. *State v. Bank*, 12 Rich., 609. *Lay v. Lay*, 10 S. C., 208. *Cope v. Hampton County*, 42 S. C., 17; 19 S. E., 1018. *State v. Mansel*, 52 S. C., 468; 30 S. E., 481. *State v. Moore*, 128 S. C., 192; 122 S. E., 672. *State v. Lewis*, 33 S. E., 351.

I repeat the quotation from *State v. Bank*, 12 Rich., 609:

"The effect of a repeal on a penalty incurred, before the repealing Act, is to discharge the penalty."

This was not a criminal action, but one for a statutory penalty.

The difficulty in the minds of those members of the Court who favor a reversal of the decree, it is respectfully suggested, lies in the application of the familiar principle that a principal is liable for the acts of an agent within the scope of his agency, and in failing to distinguish between the liability of the principal for a penalty and its liability in damages for the tortious act. The former cannot be enforced except under the statute prescribing the conditions of such liability; the latter under the principles of the common law.

As to the matter of public policy: The primary source of the declaration of the public policy of the State is the General Assembly; the Courts assume this prerogative only in the absence of legislative declaration. The General Assembly has spoken and declared that the exaction of a commission by an intermediary shall not constitute usury, and this Court has no power to decide otherwise. The Court, however, has the power, the General Assembly having made no declaration upon the subject, to declare that public policy requires that the Bank shall be liable for the tort committed by the president of a bank in the collection of an illegal exaction from a borrower.

I think, therefore, that the judgment of this Court should be an affirmance of Judge Johnson's decree.

MR. JUSTICE MARION, MR. ACTING ASSOCIATE JUSTICE R. O. PURDY, and MESSRS. WILSON, DENNIS, MANN, and MAULDIN, Circuit Judges, concur.

MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN*. A very careful consideration of this case, both as to the law and facts, renders it impossible for me to concur in the opinion of the Court. The grounds of my dissent will be set forth in as concise a statement as the importance of this case will permit.

There seems to be no doubt of the following facts: In 1912 an agreement was entered into between the brother, as agent, of the defendant and the president of the plaintiff Bank, whereby the president of the Bank should make a loan of some of the funds of the Bank to the defendant and should charge for the benefit of the Bank eight per cent. interest thereon. An extra or additional charge of two per cent. was to be paid to the president for his services in obtaining the loan for the defendant. At the end of each year the defendant paid the interest due the Bank and the additional two per cent. by separate payments, the one being to the Bank and the other to C. R. I. Brown, who was the president, personally. The charge of two per cent was not for the benefit of the Bank and was unknown to the Bank, except as it was known to the president who was making the charge for his own benefit. It was also known by the defendant that the Bank was not to benefit by the extra two per cent., but that it was solely for the benefit of Brown. Upon foreclosure of the mortgage by the Bank, the defendant set up the claim of usury, charging that under the law the extra two per cent. payment was unlawful and that the penalty imposed by the law against the taking of

---

*Opinion delivered after first argument and mentioned in concurrence of Circuit Judge Mauldin, and embodied in this report for that reason. W. C. Cothran, Acting Associate Justice, did not sit with the Court *en banc*.

usurious interest should inure to her benefit. The trial Judge dismissed the claim of the defendant, and the leading opinion reverses the judgment of the lower Court.

The leading opinon quotes fully from *Mayfield v. Mortgage Co.,* 104 S. C., 158, 159; 88 S. E., 370, 372. That was a jury case and the verdict was for the plaintiff. The judgment was reversed and a new trial ordered. The fee of an attorney who was, as stated in the opinion, the agent of both parties, was charged as being so excessive as to amount to usury. The judgment was reversed upon the ground that there was no evidence to show how unreasonable the fee was, and hence a verdict based upon such uncertain testimony could not stand. The Court says:

"The question for the Court is: Was the payment of this fee a cloak to hide usurious interest? If so, the penalty of usury attaches to the transaction."

Taking this question as the crux of the situation in the present case, we will review it in the light of the provisions of the Code as well as of the decided cases.

Section 3639 of the Code provides that any person or corporation who shall receive or contract to receive a greater amount of interest than is allowed by law shall pay the penalty for so doing. It must, therefore, be made to appear in the present case that the Bank either received or contracted to receive excessive interest. There is no proof whatever that the Bank received as interest a cent more than was allowed by law. It is true and is fully admitted that Brown, the president of the Bank, received the two per cent. personally, but it is also true that the Bank, through its other officers and directors, knew nothing of this transaction. It is held, however, that the Bank had knowledge of this transaction because the president of the Bank had control of the loan department, was the agent of the Bank, and was capable of binding it through the doctrine of principal and agent. It is quite true that the principal is bound by the acts of the agent when such acts are done within the scope or the apparent scope of his authority. Citations are hardly necessary

to sustain this rule, but what application has the rule to the present case? It is nowhere claimed that the president had the direct authority from the Bank to violate the interest laws of the State, and, as to the apparent authority, the agent of the borrower knew that the president was acting for himself individually. Hence, there was not even the appearance of binding the Bank to the unlawful transaction. Because a man is the representative of a bank or other corporation is no reason why he should lose his entire individuality and make the corporation responsible for his personal acts, be they right or wrong. The conduct of the agent while acting for his principal within the lines and bounds of his duties as such agent will bind the principal, but that the principal should be bound by acts of the agent done outside the scope of his employment and for his own personal gain and advantage is a doctrine to which I cannot agree.

It is claimed that because the president had charge of the loan department of the Bank he acted within the scope of his authority in charging two per cent. additional to the legal rate for his personal use. Was this a "cloak to hide usurious interest" for the benefit of the Bank? Was the Bank receiving or contracting to receive this extra interest which would cause it to incur the penalties prescribed in the Code? If so, we will be forced to put upon the testimony a construction denied by both plaintiff and defendant, for it is admitted that the Bank was not to benefit in any way by the extra charge of two per cent. This extra payment could not, therefore, have been a cloak to hide that which the Bank admittedly did not receive.

The cases in the State touching this subject appear to deal largely with the reasonableness of the fee, commission, or extra payment made to the agent and with the knowledge of the principal relative thereto. Neither of these points is raised in the present case. The reasonableness of the two per cent. charge was not questioned and the want of knowledge on the part of the Bank was not doubted.

19—S. C.—135.

One of the first cases on this subject is *Brown v. Brown*, 38 S. C., 173; 17 S. E., 452. In that case a commission of twenty per cent. was charged on a loan of $7,500. The Court held that this was unreasonable and excessive and permitted the claim of usury to prevail under the law as then existing. The opinion says:

"The terms of the Act show that the lawmakers had in contemplation a direct contract between the lender and the borrower, and the offense denounced is against the lender for the taking or 'allowing' of a greater rate of interest than the law allows. * * * I suppose, also, that one who negotiates a loan of money may properly be allowed reasonable compensation for his expenses and trouble, in addition to interest."

Further the opinion says:

"Now, the question is, did this contract to pay the $1,500 make the loan usurious as to the mortgagees, who were the actual lenders? The decisions on the general subject are not at all in accord; but, without attempting to review and reconcile the numerous cases cited, we think the weight of authority makes that depend upon the question of fact, whether the contract to pay an excessive and unreasonable amount, such as what is here called 'commissions,' to the middlemen (no matter by whom made), was known to those who furnished the money upon it. If they knew the facts when the proposition was made and accepted, the loan will be held to be usurious."

In a very able opinion Chief Justice McIver dissented, holding that even though the lender did know that the borrower was paying an additional sum to an agent to obtain the loan, yet this did not constitute usury as the lender was not interested and derived no benefit.

Testing the present case by either the opinion of the Court or by the dissenting opinion in the *Brown Case*, no usury can be found. Knowledge by the lender of the excessive amount was the test in the opinion, while in the dissent it was held that both knowledge and amount were

immaterial. In the present case no charge is made that the amount paid was excessive, and the only knowledge charged to the Bank was the knowledge of the president in a matter without the scope of his authority as president but a personal matter of his own.

In *Mortgage Co. v. Woodward,* 83 S. C., 521; 65 S. E., 739, the authorities are carefully reviewed. The same question of excessive charges was again made the point in issue, and the opinion says:

"We regard a charge of twenty per cent. of the amount of the loan as commissions unreasonable and excessive for any service rendered * * * for the benefit of the defendant. We hold, therefore, that the transaction is usurious."

The basis of this decision was likewise the knowledge of the lender and the excessive amount, both of which points have been previously referred to.

Discussing further the relation of Brown, the president, to the Bank, reference is made to a few of the many authorities.

In 31 Cyc., 1573, it is said:

"The payment of a secret commission, bribe or gratuity to the agent (Brown) by the third party (Heyward) as an inducement for entering into contractual relations on behalf of his principal (the Bank), or an agreement to pay such commissions, is such collusion as entitles the principal to avoid the contract."

In holding that the principal is bound by the acts of his agents done within the scope of his authority, the Court in *Williams v. Insurance Co.,* 105 S. C., 311; 89 S. E., 676, says:

"And it unquestionably would be in violation of the spirit of this rule if a principal should be allowed to reap a benefit from the wrongful and unauthorized act of an agent."

In *Wacasie v. Radford,* 142 Ga., 113; 82 S. E., 442, the Court says:

"That the lender's agent charges in addition to the maximum legal rate, a commission for obtaining the loan, will not render the transaction usurious as to the lender, where he does not know of or share in such charges."

In *Silverman v. Katz* (Sup.), 120 N. Y. S., 790, the Court says:

"That the lender's agent exacted a bonus from the borrower does not render the transaction usurious, where the lender received no part of the bonus and had no knowledge of such exaction."

Directly in point is *Brown v. Jones*, 89 Misc. Rep., 538; 152 N. Y. S., 571. The Court says:

"A payment to the lender's agent by the borrower's agent without knowledge of the lender and from which the lender received no benefit, does not make the contract usurious."

In *Testera v. Richardson*, 77 Wash., 377; 137 P., 998, the Court says:

"Payment to the agent of a chattel mortgagee for his services in preparing the note and mortgage and releasing a prior one, held not to render the transaction usurious although twelve per cent. interest was charged."

Numerous other cases to the same effect could be cited, but the length of this opinion would be unduly prolonged.

The claim of usury in this case is based upon the Act of 1898, now appearing as Section 3639 of the Code. In 1916 another Act was passed, now known as Section 3640, which provides that no lender shall be charged with usury by reason of money paid or agreed to be paid others in order to obtain a loan where the lender neither took nor agreed to take more than lawful interest. The attorney for the appellant insists that this section has no application for two reasons: That it was not of force in 1912 when the transaction herein was made, and that the word "others" in the Act relates to disinterested parties. That Brown was a disinterested party, so far as the interest of the Bank was con-

cerned, has been pointed out and emphasized in the first part of this opinion. What effect, if any, did the Act of 1916 have on this case other than to show the policy of the State against such stringent provisions relative to usury? Whether or not the Act had a retrospective effect on contracts made before its passage presents a very interesting question which will not be decided at this time. The question for determination is the effect of the Act of 1916 in regard to making so great a change in the Act of 1898, which was clearly a penalty statute.

In 25 R. C. L., 943, the rule is thus expressed:

"Since there can be no vested right in a penalty until it has been reduced to judgment, the unqualified repeal of a statute imposing a penalty operates the same way as the repeal of a strictly criminal statute, that is, it abrogates all rights of action which have not been reduced to judgment, and all pending actions and proceedings to recover a penalty which had not been prosecuted to a final judgment are defeated by the repeal. * * *

"After the repeal of a usury law, no forfeiture or penalty can be visited on the party holding the usurious contract."

The writer does not contend that the Act of 1916 repealed the Act of 1898, but he does contend that the Act of 1898 was so changed by the Act of 1916 that had the mortgages in the present case been executed after 1916 the claim of usury would have been defeated by the provisions of that Act.

To sustain this view of the law only two cases will be cited, but as they are from the Supreme Court of the United States and the Supreme Court of South Carolina, it would seem that they are all-sufficient.

In *Ewell v. Daggs,* 108 U. S., 143; 2 S. Ct., 408; 27 L. Ed., 682, the Court says:

" * * * Whatever the statute gives, under such circumstances, as long as it remains in *fieri,* and not realized by having passed into a completed transaction, may, by a sub-

sequent statute, be taken away. It is a privilege that belongs to the remedy, and forms no element in the rights that inhere in the contract."

In *State v. Mansel,* 52 S. C., 468; 30 S. E., 481, the Court says that the Court of General Sessions has no jurisdiction of an offense of violating a statute which has been repealed before trial. This case was followed and approved in *State v. Lewis* (S. C.), 33 S. E., 351.

It would, therefore, appear that the Act of 1916, having been passed before any judgment was entered or any suit brought in the present case, is conclusive of the question.

It is held in the leading opinion that the act of the Bank was usurious and that an affirmance of the judgment would kill the usury laws of this State. In neither of these conclusions can I agree. I have endeavored to show that the conduct of the Bank was legal and that it was not bound by the unlawful acts of its president which were for his own personal benefit and carefully concealed from the Bank. In regard to the death of the usury laws, it need only be said that the usury laws are active in those States which disclaim usury in cases similar to this; cases where the agent makes a personal profit from a trade with the borrower and where both agent and borrower withhold and conceal all information relative thereto from the lender.